Richard D. Burbidge (#0492)
rburbidge@burbidgemitchell.com
Beau R. Burbidge (#17046)
beau@burbidgemitchell.com
Carolyn LeDuc (#14240)
cleduc@ burbidgemitchell.com
Abigail Dizon-Maughan (#14436)
adm@burbidgemitchell.com
BURBIDGE | MITCHELL
215 South State Street, Suite 920
Salt Lake City, Utah 84111
Telephone: 801-355-6677
Facsimile:  801-355-2341

*Attorneys for US Magnesium, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

|  |  |
|---|---|
| US MAGNESIUM, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>ATI TITANIUM, LLC, a Delaware limited liability company; ALLEGHENY TECHNOLOGIES, INC, a Delaware corporation; and Does 1-20,<br><br>Defendants. | **US MAGNESIUM, LLC'S SECOND AMENDED COMPLAINT**<br><br><br>**REDACTED PURSUANT TO COURT ORDER (DKT. 51)**<br><br>Civil No. 2:17-cv-00923-DB<br><br>District Judge Howard C. Nielson, Jr.<br><br>Magistrate Judge Paul M. Warner |
| ATI TITANIUM, LLC, a Delaware limited liability company,<br><br>Counterclaim Plaintiff,<br><br>vs.<br><br>US MAGNESIUM, LLC, a Delaware limited liability company, |  |

| Counterclaim Defendant. | |

US Magnesium, LLC ("USM"), by and through counsel, alleges and complains as follows:

## PARTIES

1.     US Magnesium, LLC ("US Mag"), is a Delaware limited liability company with a place of business in Tooele County, Utah.

2.     ATI Titanium, LLC ("ATI"), is a Delaware limited liability company with places of business in Tooele County, Utah and Allegheny County, Pennsylvania.  ATI owns a titanium sponge plant ("Titanium Sponge Plant") in or near Rowley, Utah.

3.     Defendant Allegheny Technologies, Inc. ("Allegheny"), is a Delaware corporation with a place of business in Allegheny County, Pennsylvania.  Allegheny's business is to produce specialty materials and components, including titanium and other metals.  Allegheny's operations are separated into two segments – the High Performance Materials and Components ("HPMC") Segment, and the Flat-Rolled Products Segment.  Through a chain of wholly-owned subsidiaries,[1] Allegheny is the parent corporation of Defendant ATI.  ATI is a part of Allegheny's HPMC division.

4.     As more fully discussed below, ATI has been entirely dominated and controlled by Allegheny, such that the separate personalities of Allegheny and ATI did not exist and instead

---

[1] Allegheny wholly owns and controls ATI Funding Corporation.  ATI Funding Corporation, in turn, wholly owns and controls ATI Operating Holdings, LLC.  ATI Operating Holdings, LLC, wholly owns and controls TDY Holdings, LLC.  TDY Holdings, LLC wholly owns and controls TDY Industries, LLC, which is the sole member of ATI Titanium, LLC, defendant in this action.

an alter ego or principal/agent relationship existed involving, *inter alia*, commingling of business operations; common management and legal representation; sharing of headquarters and employees in Pittsburgh, Pennsylvania; non-arm's length transactions; consolidated summaries of operations and financial statements; absence of corporate records for ATI; a failure to follow corporate formalities on the part of ATI; and Allegheny's siphoning of funds from ATI, causing ATI to be (and remain) undercapitalized, despite Allegheny's substantial earnings from the products produced at the Titanium Sponge Plant.

5.     Allegheny completely dominates and controls ATI, such that ATI is its mere instrumentality and agent.  The managers of ATI are all directors, officers, or in-house counsel of Allegheny, who manage ATI in the interests of Allegheny.  Further, Allegheny has held itself out as owning and controlling the Titanium Sponge Plant, has frequently publicly referred to the Titanium Sponge Plant as "***our*** Rowley, UT facility" (emphasis added), and presents ATI's operations and financial performance as that of its own in its communications with shareholders, the government, and the public.  Using its dominion and control over ATI, Allegheny made business decisions for ATI, including the decisions to (1) execute new third-party contracts for titanium sponge before even declaring Economic Force Majeure under the subject Supply and Operating Agreement; (2) idle the Titanium Sponge Plant without providing US Mag any opportunity to negotiate revised pricing, as required by contract; and (3) shutter the Titanium Sponge Plant only 39 days after declaring EFM.

6.     Defendants Does 1 through 20 are persons that may be liable for the claims or damages set forth herein, but whose specific names are yet unknown to Plaintiff.  When Plaintiff

discovers the true identities of Does 1 through 20, Plaintiff shall amend this Complaint to allege their true identities.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because complete diversity of citizen exists between Plaintiff US Mag and Defendants ATI and Allegheny, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      This Court has personal jurisdiction over ATI because, by entering into a contract calling for performance within Utah, by owning and operating a titanium manufacturing facility within Utah, and by engaging in the other conduct alleged herein, ATI resides in and/or does business in Utah such that ATI (a) has continuous and systematic contacts with Utah and/or (b) has the requisite minimum contacts with Utah in relation to the cause(s) of action alleged herein.

9.      This Court has personal jurisdiction over Allegheny because Allegheny entered into contracts calling for performance within Utah, and by virtue of Allegheny's alter ego and principal/agent relationship with ATI.  The Court has jurisdiction over Allegheny due to its actions and decisions directed towards this forum regarding matters at issue in this lawsuit, including but not limited to (a) negotiation and execution of multiple agreements; (b) substantial dealings with ATI and US Mag over the course of the parties' performance under the relevant agreements; and (c) Allegheny's decisions and actions respecting the idling of the Titanium Sponge Plant in Rowley, Utah.

10.      Venue is proper in the Court under 28 U.S.C. § 1391(a) because a substantial portion of the events and omissions giving rise to US Mag's claims took place in a Rowley, Utah.

4

## GENERAL ALLEGATIONS

### Establishment of the Parties' Supply and Operating Agreement

11.    Allegheny is a multi-billion-dollar publicly traded enterprise, with myriad subsidiaries, and with plants and administrative offices all over the globe.

12.    Plaintiff is a producer and supplier of magnesium, and operates a manufacturing facility (the "US Mag Facility") in or near Rowley, Utah.

13.    Prior to 2006, US Mag supplied solid magnesium to an Oregon branch of what is now Allegheny.  Allegheny's Oregon facility heated US Mag's solid magnesium to a molten state for use in its titanium sponge manufacturing process.

14.    For titanium production, one of Allegheny's other raw materials was titanium tetrachloride, $TiCl_4$.  Through what is known as the "Kroll Process," Allegheny's Oregon facility used molten magnesium to strip or reduce chlorine off of titanium tetrachloride, as represented by the following chemical equation:  $TiCl_4 + 2Mg \rightarrow Ti + 2MgCl_2$.  Thus, the byproduct of Allegheny's titanium sponge production was $MgCl_2$, magnesium chloride.

15.    For the manufacture of titanium sponge, the Kroll Process cannot be completed with magnesium in solid form.  The magnesium must be liquid – *i.e.,* molten.

16.    For the Allegheny facility in Oregon, US Mag prepared standard molten magnesium, poured the molten magnesium into solid or direct chill cast molds, and let the ingots cool.  The magnesium was then transported from Rowley, Utah to Oregon.  In Oregon, where Allegheny's facility housed large industrial furnaces, Allegheny's subsidiary re-melted the solid magnesium, and then used the once-again molten magnesium to produce titanium sponge in its Kroll Process.

5

17.     Under Oregon law, magnesium chloride could be deemed a controlled waste material.  Therefore, Allegheny or its Oregon subsidiary incurred substantial expense in hauling away and disposing of their magnesium chloride byproduct.

18.     As it happened, US Mag's manufacture of magnesium used this same compound, magnesium chloride, as a raw material.  In this regard, it had been (and is) US Mag's regular commercial practice to concentrate magnesium chloride from the Great Salt Lake, and then use high-amperage electrolysis to separate magnesium from chlorine, as represented by the following equation: $MgCl_2 \rightarrow Mg + Cl_2$.  US Mag would then sell the magnesium and the chlorine separately.

19.     In or around 2005, certain officers or executives of Allegheny and US Mag discussed establishing a more symbiotic and efficient relationship between the two companies. Allegheny proposed building a new titanium sponge facility in Rowley, Utah, directly adjacent to the US Mag Facility. To accomplish this, Allegheny proposed purchasing real estate and related water rights directly from US Mag.

20.     Under the proposal, Allegheny would deliver to US Mag all of the magnesium chloride byproduct derived from its manufacturing process.  Allegheny would thus avoid the cost of handling and disposing of this byproduct. US Mag could then use the magnesium chloride to produce more magnesium.  Excess chlorine could then be sold by US Mag to third-party buyers.

21.     Under the proposal, US Mag would transport molten magnesium directly from the US Mag Facility to Allegheny's new, neighboring Titanium Sponge Plant, eliminating the interim step of converting the magnesium to solid form for transport.  Allegheny could thus

avoid transportation costs for solid magnesium and the costs associated with melting magnesium ingots.

22.     In this proposed recycling arrangement, the parties' exchange of materials would have to be carefully coordinated.  Indeed, Allegheny represented to US Mag that it would require a regular feed of molten magnesium to keep its Kroll Process operating consistently and thus maximize efficiencies.

23.     Also, US Mag would have to bring into operation new electrolytic cells to accommodate a steady supply of magnesium to Allegheny.  These cells would require the regular return of magnesium chloride to prevent cell deterioration.  Thus, US Mag would depend on Allegheny for a return supply of magnesium chloride.  Unless US Mag's electrolytic cells had a regular feed of magnesium chloride, they would stop producing magnesium, and they would degrade and break down, causing irreparable cell damage.

24.     Given the above complexities, the proposed new symbiotic arrangement would work only if the parties agreed in good faith to recycle materials on a regular basis – 24 hours a day, seven days a week.

25.     US Mag and Allegheny agreed to create this new interdependent recycling relationship.

26.     In and around 2006, Allegheny's executives, officers, and agents traveled to Utah to negotiate this agreement and tour the US Mag facility.  They also traveled to Utah to secure substantial tax benefits and changes to Utah law to accommodate Allegheny's anticipated construction of the Titanium Sponge Plant.

27.      In early 2006, Allegheny and US Mag entered into two agreements – one on January 25, 2006 ("Confidentiality Agreement") and another on April 12, 2006 ("Exclusivity Agreement"), copies of which are attached hereto as Exhibits A and B, respectively.  Both contracts were to facilitate Allegheny's "exploratory process," so that Allegheny could study the feasibility of constructing a "Titanium Sponge Plant *to be owned and operated by [Allegheny]*."[2]

28.      The Exclusivity Agreement provided that while this "feasibility study" was in progress, the parties would "negotiate in good faith the agreements that they would expect to sign at the end of the feasibility study period if [Allegheny] elect[ed] to proceed" with the project.

29.      The Exclusivity Agreement further provided that US Mag's recycling relationship with Allegheny would be "exclusive," and that:

> In the event [Allegheny] agrees to build the Titanium Sponge Plant on USMAG's Adjacent Property, *the exclusivity would last for a period of at least twenty years,* and *USMAG would supply molten magnesium for titanium sponge exclusively to [Allegheny];* provided, however, that in the event [Allegheny] fails to purchase a minimum of 5,000 TPY of magnesium from USMAG for two consecutive calendar years, or in the alternative fails to reasonably offer to compensate USMAG for such failure, USMAG would have the right to terminate the foregoing exclusivity provision.

(Ex. B., ¶ 5 (emphasis added).)

30.      In or about May of 2006, while negotiations between the parties were still ongoing, Allegheny formed ATI Titanium, LLC ("ATI") as a Delaware LLC.  ATI did not become authorized to do business in Utah until August 31, 2006.

---

[2] Allegheny often refers to itself as ATI.  However, the reference to "ATI" in these agreements should not be construed as a reference to ATI Titanium, LLC, which is the other defendant in this litigation.  ATI Titanium, LLC did not exist at the time that US Mag and Allegheny entered into these contracts.

31.     On or about September 1, 2006, US Mag and this new entity, ATI, entered into the Supply and Operating Agreement ("S&O Agreement"), attached hereto as Exhibit C, agreeing that the S&O Agreement would be governed by Utah law.  In the S&O Agreement, ATI promised to obtain magnesium from Plaintiff for use in manufacturing titanium sponge in a plant (*i.e.*, the Titanium Sponge Plant) that ATI planned to construct, and eventually did construct, on real property adjacent to the US Mag Facility.  For such construction, ATI purchased real property from US Mag by a separate contemporaneous agreement.

32.     L. Patrick Hassey purported to execute the S&O Agreement on behalf of ATI. However, Mr. Hassey had no discernable position with ATI.  He was Allegheny's CEO.

33.     US Mag's anticipated rights and benefits under the Exclusivity Agreement were captured in the S&O Agreement.

34.     In this regard, the S&O Agreement expressly affirmed that the earlier Exclusivity Agreement between US Mag and Allegheny was still in "full force and effect."  (Ex. C., S&O Agreement § 13.5.)   More specifically, the S&O Agreement stated as follows:

> Notwithstanding this integration clause, the parties hereby agree and acknowledge that the Agreement between Allegheny Technologies Incorporated and Seller dated April 12, 2006 (the "April 12, 2006 Agreement") is in no way merged into, modified by, or cancelled by this Agreement, and that the April 12, 2006 Agreement, including, without limitation, Section 5 thereof, ***survives in full force and effect.***

(Emphasis added.)

35.     Thus, under the Exclusivity Agreement, US Mag had the obligation to provide molten magnesium to no titanium sponge producer other than *Allegheny* for the next twenty years.  But whereas the "Buyer" of molten magnesium under the S&O Agreement was *ATI* and not Allegheny, all parties necessarily deemed ATI and Allegheny to be one and the same.

36.     All "notices" under the S&O Agreement were to be delivered to "ATI Titanium, LLC *c/o Allegheny Technologies Incorporated*" at Allegheny's corporate offices.

37.     Section 9.1 of the S&O Agreement provided that the S&O Agreement had a term of twenty (20) years from the start of "Commercial Operations."  Pursuant to Article 1 of the S&O Agreement, "Commercial Operations" commenced when the Titanium Sponge Plant met a certain production threshold – i.e., when the Titanium Sponge Plant produced "titanium sponge that conforms to the specifications set forth in Schedule 1.1(a) hereto for three (3) consecutive calendar months at an annualized rate of at least twelve million (12,000,000) pounds per year." (*See* Ex. C, S&O Agreement, definition for "Commercial Operations.")  On information and belief, ATI met this production threshold on or about September 6, 2012.  Therefore, the term of the S&O Agreement would continue until September 6, 2032.

*The Parties' Performance Under the S&O Agreement*

38.     As the parties' recycling relationship carried forward, US Mag provided molten magnesium to no party other than Allegheny (through ATI).

39.     US Mag provided yearly pricing forecasts, while ATI provided annual and monthly forecasts for the amount of magnesium that ATI would require.

40.     In the early stages of operation at the Titanium Sponge Plant, ATI purchased a small amount of solid magnesium – which may have been for purposes of testing equipment. However, after the Titanium Sponge Plant became fully operational, ATI purchased no solid magnesium.  Indeed, ATI had no use for solid magnesium because, as explained above, the Kroll Process requires magnesium in molten form.

41.     Under Section 3.2(b) of the S&O Agreement, ATI was obligated to take no less than 12 million pounds of magnesium per year from US Mag.  For several years after ATI began "Commercial Operations," ATI and US Mag engaged in a continuous exchange of US Mag's molten magnesium for ATI's magnesium chloride.

42.     Throughout the parties' relationship, for every pound of magnesium delivered from US Mag to ATI, ATI returned magnesium chloride at a rate of approximately fourfold. Therefore, as a practical matter, ATI's forecasts for its molten magnesium requirements served also as forecasts of the amount of magnesium chloride that US Mag could expect to receive back from ATI.

***ATI Acknowledges and Affirms That Its Contractual Relationship with US Mag is a "Lease" or "Recycling" Arrangement***

43.     In or about 2013, ATI faced the prospect of paying millions in sales tax for its purchases of molten magnesium from US Mag.  Therefore, ATI approached US Mag to request that US Mag enter into an amended agreement—to more accurately characterize the true nature of parties' relationship.

44.     On or about January 31, 2014, ATI and US Mag entered into a "First Amendment to the Agreement Dated September 1, 2006 Between ATI Titanium, LLC and US Magnesium LLC" ("Lease Agreement"). A true and correct copy of the Lease Agreement is attached hereto as Exhibit D.

45.     In the Lease Agreement, the parties emphasized that they were not changing their original S&O Agreement; they were only re-phrasing it to more accurately reflect the true nature of the commercial relationship. In this regard, the second and third paragraphs of the Recitals to the Lease Agreement state as follows:

Whereas, ATI Titanium and US Magnesium after having reviewed the Supply and Operating Agreement, have concluded that it is appropriate to amend said Agreement **to more accurately identify the substance of the transactions** conducted pursuant to that Agreement, the nature of the relationship between the Parties to that Agreement and to revise the actual name of that Agreement,

**Whereas, since US Magnesium establishes an inventory of Magnesium for use by ATI Titanium and since US Magnesium performs services on the Magnesium inventory to enable ATI Titanium to continue to use the Magnesium, <u>the transaction is in effect a lease and service arrangement</u>.** Accordingly, the Parties have determined that it is appropriate for US Magnesium to charge a Rental Fee and a Service Fee for the services provided to ATI Titanium.

(Emphasis added.)

46.     The Lease Agreement nominally characterized US Mag not as a "seller" of magnesium, but rather as a "lessor." ATI was labeled "lessee." (*See* Ex. D, Lease Agreement, Recitals A(1)-(3).)  The relationship was characterized as a "lease" arrangement under the following general terms:

From time to time on and after the execution of this First Amendment, and subject to the other provisions of the Agreement as amended, Lessor will lease to Lessee, and Lessee will lease from Lessor, Magnesium produced at [US Mag's] Magnesium Production Facility in exchange for the Rental Fee set forth in Schedule 2.1 hereof.  Additionally, from time to time on and after the execution of this First Amendment and subject to the other provisions of the Agreement as amended, Lessor will perform certain services on the Magnesium for Lessee in exchange for the Service Fee set forth in Schedule 2.1 hereof. Lessee will be responsible for any sales and use taxes that relate to the Rental Fee and Service Fee payments made by the Lessee to the Lessor. Under no circumstance, shall [L]essor be responsible for any sales and use tax related to this agreement, provided that Lessor shall provide Lessee with a valid Utah resale exemption certificate for all of Lessor' purchases of chlorine from Lessee.

(Lease Agreement, § 2.1 (emphasis added).)

47.     The "Rental Fee" was in lieu of US Mag's sale price from the original Agreement.  And, the "lease" concept was supported by the acknowledged chemical principle

that virtually all of the molten magnesium atoms supplied by US Mag came back to US Mag with chlorine, in the form of magnesium chloride.

48.    Where the above provision states that "Lessor will perform certain services on the Magnesium," it is referring to US Mag's conversion of ATI's magnesium chloride waste back into separate magnesium and chlorine—with the molten magnesium to be returned to ATI for another round of titanium production. This was the selfsame reduction and recycling process in which the parties had engaged from the start.

49.    Internal documents from Allegheny and ATI acknowledge that the relationship was a "recycling" relationship.

50.    REDACTED

REDACTED

51.     In 2015, and as result of such lobbying efforts, the Utah legislature enacted Senate

Bill 21.  Pursuant to Senate Bill 21, Utah Code section 59-12-104(83) now provides a tax

exemption for "amounts paid or charged for a ***purchase or lease of molten magnesium***."

52.     Immediately following the Utah legislature's enactment of a new sales tax

exemption for molten magnesium, ATI and US Mag agreed that with their understanding of "the

substance of the transaction," and the nature of the relationship between the parties, as expressed

in the Lease Agreement, the parties could return to their original S&O Agreement from 2006.

***ATI Could Invoke an "Economic Force Majeure" Clause Only Under Limited Conditions***

53.     The S&O Agreement between US Mag and ATI included a provision for

Economic Force Majeure ("EFM").  EFM arose only under the following limited circumstances:

> Buyer [ATI] obtains a bona fide, good faith and arm's length written contract
> offer or offers from another supplier or other suppliers of titanium sponge for the
> sale to Buyer [ATI] of a supply of titanium sponge of like grade, quantity and
> quality to that being produced at the Titanium Sponge Plant and such written
> contract offer(s) would result in Buyer's [ATI's] obtaining titanium sponge for a
> period of at least five (5) consecutive years at a price DDP to any facilities of
> Buyer [ATI], [Allegheny], or any of their respective Affiliates at or below eighty-
> five percent (85%) of its variable costs to produce titanium sponge at the
> Titanium Sponge Plant.

(Ex. C, Agreement, § 11.2 (emphasis added).)

54.     The S&O Agreement provided that even if any competing titanium sponge offers

met these foundational EFM requirements, then both parties would participate in a negotiation

process to try to avert the EFM.  In this regard, the S&O Agreement stated:

> Buyer may suspend its performance under this Agreement, including, without
> limitation, its purchase of Magnesium under this Agreement, upon at least one
> hundred eighty (180) days' prior written notice to Seller (the "Economic Force

14

Majeure Notice"); *provided, however, that Buyer and Seller will enter into good faith negotiations during such one hundred eighty (180)-day period to attempt to negotiate revised pricing for Magnesium under Schedule 2.1 of this Agreement.*

(*Id.,* § 11.2) (certain emphasis in original).

55.     If the parties were able to arrive at new pricing terms, the EFM would be averted and the interdependent relationship would continue. (*Id.,* § 11.2.)

56.     However, *even if* ATI established that some competing offer met the qualifications to invoke an EFM, and *even if* ATI and US Mag did not succeed in negotiation to avert the EFM, ATI had the obligation to continue to fully perform under the S&O Agreement until the expiration of the 180-day post-notice period.  (*Id.,* § 11.2.)

***Disregarding the EFM Clause Under the Parties' S&O Agreement, Allegheny Determines to Close the Titanium Sponge Plant to Make Greater Profits With Cheap Foreign Imports***

57.     During the course of ATI's operations, Allegheny did not transact business with ATI at arm's length.  In this regard, virtually all of the titanium sponge manufactured at ATI's Titanium Sponge Plant was transported to other Allegheny facilities and incorporated into end products sold by Allegheny or its affiliates.  Therefore, ATI's primary "customer" was, in effect, Allegheny.  Accordingly, all or virtually all of ATI's theoretical "income" was derived from Allegheny.  ATI did not maintain any bank account in its own name.  Therefore, if ATI ever had any "income," it did not take possession of the same.

58.     On information and belief, ATI never entered into any contractual relationship with Allegheny or any affiliate regarding the sale or purchase of titanium sponge.  Instead, on Allegheny's consolidated financial reports, Allegheny appears to have simply assigned a value to

ATI's goods and analyzed ATI's "income" accordingly.  Allegheny's internal communications refer to ATI as merely a "cost center."

59.      In Allegheny's public SEC filings, Allegheny reported that its HPMC Section, which included the Titanium Sponge Plant, earned in excess of a billion dollars in profits for the years 2011-2015.   However, Allegheny determined that it would attribute an amount of "income" to ATI that did not even cover ATI's cost of production, and therefore provided ATI no profit margin at all.  On information and belief, Allegheny never actually "paid" ATI anything for its goods or services, but only provided ATI certain amounts necessary to cover operating expenses.

60.      Allegheny's failure to pay ATI a titanium sponge price that provided a profit margin, particularly in light of Allegheny's substantial profits for the HPMC Section as a whole, was tantamount to a siphoning of funds from ATI.

61.      Meanwhile, in or about 2015 or early 2016, Allegheny determined that despite its substantial past profits derived from the manufacture of titanium sponge at the Titanium Sponge Plant, Allegheny could make even greater profits by purchasing cheap titanium sponge that had been manufactured outside the United States.  Thus, Allegheny began negotiations with certain foreign titanium sponge suppliers, to replace the volume of sponge that had been produced at the Titanium Sponge Plant.

62.      In late June of 2016, Allegheny officers Jim Stearns and Brad Forsythe scheduled a meeting in Utah with US Mag's president, Ron Thayer.[3]  Documents produced in this litigation

---

[3] Jim Stearns was the Purchasing Director for Allegheny's Specialty Alloys & Components Division; Brad Forsythe was Allegheny's Vice President of Supply Chain and Purchasing.

show that these Allegheny officers later invited Steve Knight, ATI's local plant manager, to attend if he was "available."  Unbeknownst to US Mag or Mr. Thayer, Allegheny had already begun to negotiate and/or execute agreements with foreign suppliers of titanium sponge, such that Allegheny would soon no longer require titanium from the Titanium Sponge Plant.  Keeping Mr. Thayer in the dark about these developments, Allegheny's officers and ATI's plant manager asked whether US Mag would reduce its price for magnesium by 50 percent.

63.     Neither Allegheny nor ATI had invoked the S&O Agreement's EFM clause. Therefore, US Mag had no obligation to negotiate revised pricing.  In such context, Mr. Thayer declined to commit to any price reduction.

64.     Documents produced in this litigation show that "50 percent" was a greater pricing reduction than ATI would have actually required to avert the alleged EFM.  On information and belief, this was a calculated and deliberate misrepresentation on the part of Allegheny.  In this regard, Allegheny never had an objective to avert the EFM, but was solely interested in maximizing its own profits.

65.     On or around July 6, 2016, Mr. Thayer again met with Steve Knight, ATI's local manager.  Mr. Knight represented that ATI had allegedly identified sponge suppliers who could provide sponge for about $3.00 per pound.  This pricing information was false.  Mr. Knight inquired what US Mag would do if ATI decided to cease producing sponge at the Titanium Sponge Plant.  Again, Mr. Knight did not invoke the S&O Agreement's EFM clause.

66.     REDACTED



67.     On or about July 21, 2016, Mr. Thayer and Cameron Tissington, US Mag's Vice President of Sales and Marketing, participated in a phone call with Allegheny officer Brad Forsythe.  Mr. Forsythe informed US Mag's officers that Allegheny and ATI were working on plans to quickly ramp down production at the Titanium Sponge Plant and possibly cease production completely in a very short time frame.  Again, Allegheny did not inform US Mag's officers that Allegheny was already negotiating and/or executing third-party sponge contracts.

68.     Mr. Forsythe informed US Mag that *even if* US Mag lowered its price for molten magnesium, this would not change Allegheny's and ATI's ramp-down plan.  Nevertheless, Mr. Forsythe asked whether US Mag could lower its price, and by how much.

69.     Because Mr. Forsythe had not invoked the EFM clause and had stated that a new price would make no difference to any decision about the Titanium Sponge Plant, US Mag's officers declined to provide new pricing offer.  US Mag's officers informed Mr. Forsythe that they expected ATI to follow the S&O Agreement.

70.     REDACTED



71.     By August 19, 2016, Allegheny's officers and agents had executed new third-party sponge contracts with foreign suppliers, such that Allegheny would no longer require titanium sponge from the Titanium Sponge Plant.

72.     On or about August 23, 2016, Allegheny's Board of Directors met to discuss the fate of the Titanium Sponge Plant.  Allegheny's meeting minutes reflect that the following action was taken:

> Approved the indefinite idling of the Company's Rowley, Utah titanium sponge manufacturing facility and the related press release.

73.     The following day, on August 24, 2016, Allegheny issued a press release:

> PITTSBURGH -- (BUISNESS WIRE) -- AUGUST 24, 2016 – Allegheny Technologies Incorporated (NYSE:ATI) today announced several actions to improve the Company's future financial performance, which include the **indefinite idling of the Rowley, UT titanium sponge production facility** and consolidating certain titanium manufacturing operations in Albany, OR.

> ***These actions are expected to improve [Allegheny's] annual operating income by approximately $50 million beginning in 2017.***  In addition, these actions are expected to generate approximately $50 million cash flow from lower managed working capital as titanium sponge inventory is reduced over the next several quarters.
>
> …
>
> As a result of this ongoing process, ATI is taking several actions to improve the profitability and enhance the competitiveness of ATI's High Performance Materials & Components segment:
>
> …
>
> ***In support of ATI's growing titanium products business and to ensure a reliable supply of high quality and cost effective titanium sponge, [Allegheny] has entered into long-term, cost competitive supply agreements with several leading global producers of premium-grade and standard-grade titanium sponge.  The lower cost titanium sponge purchased under these supply agreements will replace the titanium sponge produced at [Allegheny's] Rowley facility.***
>
> ***As a result, [Allegheny's] Rowley, UT titanium sponge facility will be idled by the end of 2016…*** [4]

(Emphasis added.)

74.     On the same day that Allegheny issued the above press release, August 24, 2016, US Mag received a letter (dated August 23, 2016) signed by Allegheny Senior Vice President, Elliot Davis.  Mr. Davis stated:

> The purpose of this letter is to provide US Magnesium, LLC with written notice that ATI Titanium LLC ("ATI") is declaring an Economic Force Majeure pursuant to Section 11.2 of the Agreement between the parties as we have received an offer for titanium sponge that satisfies the requirements of that Section. Accordingly, ATI will be suspending its performance under the Agreement one hundred eighty (180) days following this letter. We look forward to discussing with you a mutually agreeable resolution to the remaining obligations under the Agreement during the period where we are winding down operations and our need for magnesium.

---

[4] Again, the Court will observe that Allegheny refers to itself as "ATI."  By context in the press release, the Court can see that Allegheny used "ATI" as a reference to itself, and not to its Utah-based subsidiary.

75.     Because the S&O Agreement provided several criteria for establishing EFM, US Mag had expected that if ATI invoked an EFM, ATI would disclose the "written contract offers" upon which such invocation was based.  US Mag also expected to have the opportunity to review ATI's calculation of the latter's variable costs and its comparison of those costs to the pricing terms under these "written contract offers."

76.     US Mag understood that if ATI provided copies of the "written contract offers," US Mag would use those offers to determine an appropriate price point for negotiations, and/or to ascertain if an audit of ATI's EFM calculations would be necessary.

77.     The EFM Notice did not include, reference, enclose, or attach any "written contract offer[s]" from any third-party suppliers of titanium sponge. The EFM Notice did not set forth any of the alleged terms of these alleged new offers.

78.     The EFM Notice did not include, reference, enclose, or attach any evidence that ATI's purported new third-party provider(s) had agreed to provide sponge of "like grade, quantity and quality" to that which ATI had been manufacturing at the Rowley Titanium Plant.

79.     The EFM Notice did not identify the names of any proposed new suppliers of titanium sponge, nor provide any evidence that the alleged new offer(s) had been negotiated at arm's length.

80.     The EFM Notice did not purport to inform US Mag of the duration of time for which these alleged other suppliers had allegedly promised to supply titanium sponge.

81.     The EFM Notice did not purport to inform US Mag of ATI's variable costs to produce titanium sponge, nor did it disclose the price at which alternative suppliers were allegedly prepared to supply titanium sponge. Therefore, US Mag had no benchmark from which

to formulate proposals for revised pricing of magnesium, much less engage in good faith negotiations—as required by the S&O Agreement.

82.     The EFM Notice did not recognize US Mag's right to negotiate for revised pricing.  Instead, as shown above, the EFM Notice stated that ATI "will be suspending its performance under the S&O Agreement one hundred eighty (180) days following this letter."

83.     One week later, on or about August 30, 2016, at a meeting between executives of ATI/Allegheny and US Mag, ATI provided US Mag a unilateral "ramp down schedule" – reflecting that ATI intended to close down operations of the Titanium Sponge Plant as soon as it exhausted its inventory of raw material (titanium tetrachloride). ATI represented that it would exhaust its raw material in just a few weeks.

***Allegheny Slow-Walks the Audit Process While "Scrubbing" ATI's Cost Calculations***

84.     As to the issue of whether ATI had properly done its variable-cost calculations for the alleged EFM, US Mag had the right, but not the obligation, to engage an independent accounting firm to conduct an audit.  In this regard, Section 11.3 provided as follows:

> Section 11.3   Audit Right for Economic Force Majeure.  If Buyer provides an Economic Force Majeure Notice to Seller, ***Seller shall have the right to engage a mutually acceptable independent accounting firm to audit Buyer's records providing evidence of the Economic Force Majeure during the one hundred eighty (180) day period*** from Buyer's provision of the Economic Force Majeure Notice to Seller until the date of its suspension of performance under this Agreement. . . .   ***Seller will notify Buyer in writing of the audit at least ten (10) calendar days before the commencement of the audit.***  The accounting firm may audit any and all records pertaining to the calculation of the declared Economic Force Majeure ***at Buyer's facility*** where they are located, provided that such audit will be conducted during normal business hours and in such a manner as to minimize any disruption to the normal business operations of Buyer.  Buyer will cooperate with the accounting firm and its representatives in finding and compiling records for the audit, and

in the answering of questions and the providing of information for the audit. Within ninety (90) days of its engagement and in no event later than the expiration of one hundred eighty (180) days from Buyer's provision of the Economic Force Majeure Notice to Seller, such accounting firm will provide a written opinion to the parties determining whether or not the requirements of an Economic Force Majeure have been met, and the Parties thereafter will be bound by the accounting firm's determination of whether or not those requirements have been met. If the requirements for an Economic Force Majeure have been met, Buyer may suspend its performance of this Agreement upon the expiration of one hundred eighty (180) days from the date of the Economic Force Majeure Notice as set forth in Section 11.2 of this Agreement. If the requirements for an Economic Force Majeure have not been met, Buyer will be required to continue to perform its obligations under this Agreement. . . .

85.    By letter to ATI dated August 31, 2016, US Mag noted that ATI's accelerated ramp down would have a significant impact on US Mag's operations, and reminded ATI of US Mag's rights under Sections 11.2 and 11.3 of the S&O Agreement. In the same letter, US Mag gave notice that it intended to commence an EFM audit within 10 days, as provided above in Section 11.3. Meanwhile, US Mag proposed a highly-qualified local auditor, Gil Miller, to perform the audit.

86.    US Mag's proposed auditor was based in Salt Lake City—where both US Mag and ATI's facilities were located. Mr. Miller had confirmed to US Mag that he and his firm could initiate the audit within 10 days (as provided by the S&O Agreement) and complete the audit within 90 days.

87.    By letter to US Mag dated September 2, 2016, Allegheny officer Elliot Davis rejected US Mag's proposed auditor with no reason specified for the rejection. Mr. Davis instead proposed KPMG, a national accounting firm.

88.     US Mag objected to KPMG because of the increased expense of retaining a large, national firm, and undertook another round of vetting for independent accounting firms in Salt Lake City.

89.     By letter to ATI dated September 9, 2016, US Mag proposed a second highly-qualified individual from a local full-service auditing firm.

90.     By letter to ATI dated September 14, 2016, US Mag reiterated and expanded on the concerns expressed in its August 31, 2016 letter, and provided ATI notice that ATI's announced closure of its Titanium Sponge Plant and plan to "ramp down and cease sponge production at its plant on an expedited basis" were "activities in breach" of the S&O Agreement. US Mag also forewarned ATI that its planned expedited shutdown of the Titanium Sponge Plant and the resulting "elimination of magnesium chloride return volume" would cause permanent damage to US Mag's electrolytic cells.

91.     Internal documents and communications show that ATI and Allegheny knew that an abrupt cessation in ATI's supply of magnesium chloride to US Mag would damage US Mag's electrolytic cells.

92.     Despite US Mag's objections, ATI immediately began ramping down the amount of magnesium it accepted from US Mag and the amount of magnesium chloride it provided to US Mag, which in turn forced US Mag, for safety reasons, to shut down electrolytic cells, permanently damaging them and rendering them unfit for future use.

93.     In a letter to US Mag dated September 16, 2016, Mr. Davis again rejected US Mag's second proposed auditor and instead proposed a firm located in Oregon. ATI continued to

ignore US Mag's objections and concerns relating to ATI's planned expedited shut down of the Titanium Sponge Plant.

94.     Unbeknownst to US Mag, Allegheny was still in the process of "scrubbing" the numbers that it planned to present to an auditor for purposes of the EFM declaration. Allegheny's unspoken purpose in delaying the audit was to prepare an "audit package," with ATI's "variable costs" artificially manipulated to be as high as possible, so as to make ATI's declaration of EFM "audit-proof."

95.     Never at any time after Allegheny's and ATI's declaration of EFM did Allegheny or ATI entertain the possibility of further negotiations with US Mag, to keep the Titanium Sponge Plant in operation.

96.     Following the declaration of EFM, neither ATI nor Allegheny invited any such negotiations.

97.     In a letter to ATI dated September 23, 2016, US Mag demanded that ATI select one of the two auditors previously proposed by US Mag to conduct the EFM audit.

98.     In a letter dated September 28, 2016, Allegheny's Elliot Davis once again wrote to US Mag.  Notwithstanding the fact that the S&O Agreement provided for an audit at "Buyer's [ATI's] facilities," Mr. Davis represented that the audit should take place in Oregon, ostensibly because "the financial records and the relevant employees necessary for the audit are all located in Albany, Oregon."

99.     ATI did not own any property or maintain any facility or office space in Oregon. On information and belief, ATI did not have a single employee in Oregon.  On information and

belief, ATI did not maintain any financial files in Oregon.  Instead, any financial files in Oregon were prepared and maintained by Allegheny or some other affiliate.

100.     On or about October 2, 2016, in further breach of the S&O Agreement, ATI ceased accepting any magnesium from US Mag and, at or about the same time, ceased providing magnesium chloride to US Mag, forcing additional electrolytic cells to be shut down and permanently damaged.  Despite ATI's obligation to continue to perform under the S&O Agreement for 180 days after declaring EFM, ATI had ceased performing after only 39 days.

101.     By terminating its "lease" of molten magnesium from US Mag and its return supply of magnesium chloride, ATI materially breached the S&O Agreement, and caused permanent damage to the electrolytic cells US Mag had used to produce magnesium, thereby frustrating and rendering futile US Mag's audit right and the process provided by Section 11.3 of the S&O Agreement.

102.     After unilaterally ceasing performance of its obligations under the S&O Agreement, ATI falsely claimed that US Mag and ATI had mutually agreed to the expedited ramping down of ATI's titanium sponge production.

103.     At that time, US Mag ceased negotiations regarding the audit process, as ATI's Titanium Sponge Plant closure had frustrated US Mag's right to negotiate a continuance of the S&O Agreement.

**_Allegheny and ATI Try to Obscure Their Breach by Issuing a Sham Forecast for Solid Magnesium_**

104.     On or about December 7, 2016, months after the Titanium Sponge Plant had ceased all production, ATI sent US Mag what purported to be an annual "forecast" for 2017, under sections 3.1(c) and (d) of the S&O Agreement.

105.   This new "forecast" stated that ATI would allegedly require the contractual minimum 12,000,000 pounds of magnesium for 2017.  However, the "forecast" failed to comply with the requirements of the S&O Agreement in several respects.

a. First, ATI had "forecast" the purchase/lease of 12,000,000 pounds of magnesium. The Agreement required ATI to purchase or lease a minimum of 12,000,000 pounds of magnesium per year. (§3.2(b).)  Thus, without any "forecast" at all, the parties knew that ATI had the obligation to purchase/lease at least that amount. The purpose of the "forecast" was for ATI to specify to US Mag how much magnesium ATI would require *over and above* the minimum 12,000,000 pounds. (§ 3.1(d).)  Therefore, this forecast was not a "forecast" at all, as the parties had understood that term.

b. Second, the forecast was conditioned upon US Mag demonstrating that no EFM had occurred. Specifically, ATI stated:

ATI Titanium hereby informs US Magnesium that, ***in the event that US Magnesium somehow successfully challenges ATI Titanium's declaration of the Economic Force Majeure***, ATI Titanium forecasts, pursuant to Section 3.1(d), that the total pounds of magnesium that ATI Titanium expects to purchase from US Magnesium during the 2017 calendar year is twelve million (12,000,000) pounds, all of which ATI Titanium elects to receive in solid form, pursuant to Section 3.2…. (Emphasis added.)

c. Third, for the first time ever, ATI requested that all of the magnesium to be supplied by US Mag would be in solid form.  The purchase of solid magnesium was contrary to the purpose the Agreement and the course of performance the parties had established over several years.

106.   US Mag would not have agreed to the S&O Agreement's terms—including, but not limited to, a 20-year magnesium price cap and substantial capital investments—without the return promise of magnesium chloride from ATI.  This return supply of magnesium chloride was a foundational understanding held by both parties during negotiations for, and performance of, the S&O Agreement.

107.   As a practical matter, US Mag depended on predictability with respect to the return of magnesium chloride, because US Mag had to know well in advance if it would need to

adjust operations to obtain additional magnesium chloride brine from the Great Salt Lake and to expand the front end of the manufacturing plant to produce more purified, dried, treated and melted magnesium chloride feed.  Moreover, Allegheny's internal communications betray that Allegheny knew it had no use for solid magnesium.

108.    By letter dated December 16, 2016, US Mag responded to the purported 2017 "forecast," informing ATI that its material breach of the S&O Agreement relieved US Mag of further performance under the S&O Agreement.  US Mag further informed ATI that its "forecast" was unreasonable because ATI's unilateral decision to close the Titanium Plant had forced US Mag to take electrolytic cells offline; the forecast was untimely; and the forecast, for the first time, had requested solid magnesium with no return supply of magnesium chloride. The forecast, US Mag stated, appeared to be "a thinly-veiled litigation scheme."

109.    ATI has since shuttered its operations at the Titanium Sponge Plant.

110.    US Mag estimates that over the anticipated life of the contract, which was scheduled to continue until approximately September 6, 2032, US Mag's damages are in the approximate range of $115 to $175 million.

111.    As set forth above, Allegheny has publicly represented that as a result of its closing the Titanium Sponge Plant, it is saving about $50 million annually.

112.    US Mag brought suit against ATI and Allegheny in 2016 (the "Stewart Action"). However, Judge Stewart dismissed Allegheny from that litigation, based on Allegheny's representations that Allegheny and ATI were allegedly "completely separate" entities.   Judge Stewart dismissed the remainder of the allegations against ATI so that the parties could attempt to mediate their dispute.  Mediation was not availing.

*Allegheny and ATI Had a Principal/Agent or Alter Ego Relationship*

113.    In connection with Allegheny's motion to dismiss the Stewart Action,

Allegheny's "Vice President, Tax," Scott Rantovich, made the following statements in a sworn

declaration:

> ATI [Allegheny] and ATI-Ti [ATI] are completely separate entities, with their
> only relationship being that of a parent and indirect subsidiary.  ATI [Allegheny]
> does not oversee the day-to-day operations to ATI-Ti [ATI]; rather, these
> activities are managed by ATI-Ti's [ATI's] employees and management team.
> ATI [Allegheny] and ATI-Ti [ATI] maintain separate and independent bylaws,
> minutes, corporate records, financial records, and bank accounts.

(Case No. 2:16-cv-01158-TS, Dkt. 16-1, ¶ 9.)

114.    Mr. Rantovich further stated that:

> ATI [Allegheny] and ATI-Ti [ATI] are also financially independent of each other.
> ATI-Ti was fully capitalized and operates under its own budget.  It is responsible
> for its own profits and losses, which are separately tracked by the company.
> Although ATI [Allegheny] does file some government-mandated consolidated
> financial reports, such as Annual Reports on Form 10-K under the Securities
> Exchange Act of 1934, ATI and its subsidiaries still maintain separate financial
> records.

(*Id.* at ¶ 10.)

115.    Documents produced in this litigation show that Mr. Rantovich's statements were

misleading or false.

116.    On public documents, shareholder reports, and internal memoranda, Allegheny

referenced ATI as a division or section of its own operations, or as a mere "cost center," and not

a separate entity.

117.    Documents show that before and during the course of ATI's operations,

Allegheny's officers, executives and agents traveled to Utah to oversee operations at the

Titanium Sponge Plant and, in addition, provided oversight and management remotely.  On

information and belief, all high-level management and financial decisions were made by Allegheny, not ATI.

118.    During the course of the parties' performance under the S&O Agreement, US Mag directed high-level operational concerns not to ATI, but to an officer or agent of Allegheny or some other Allegheny affiliate, by way of in-person meetings in Utah or through telephone calls.  Any such officer or agent purported to be acting for Allegheny and ATI concurrently, with no apparent regard for any distinction between the entities.

119.    On ATI's initial disclosures in this litigation, ATI identified six of its own witnesses who may have information pertinent to this action.  Five of these individuals are high-level officers or legal counsel for *Allegheny*.[5]   The only *non*-Allegheny employee/officer named on these disclosures was Steve Knight, ATI's local plant manager.  Put differently, ATI has identified only *one* employee from ATI who has any information about the matters at issue in this suit.  Documents show that many more officers, employees, and agents of Allegheny were involved in the factual narrative alleged above.

120.    As set forth above, it was officers of Allegheny who negotiated and executed the third-party sponge contracts that allegedly triggered ATI's EFM.  What is more, documents produced in this litigation show that ***ATI is not a party to any of the sponge offers or contracts that allegedly triggered the EFM.***  Instead, executed contracts for such titanium sponge were

---

[5] Notably, ATI's initial disclosures refer to Brad Forsythe as the "Vice President, Supply Chain of ATI."  However, public records show that Mr. Forsythe is the Vice President of Supply Chain and Purchasing for *Allegheny*.  ATI's initial disclosures also identify Patrick DeCourcy as the "Executive Vice President of ATI."  However, public records show that Mr. DeCourcy is the Chief Financial Officer and Senior Vice President of Finance at *Allegheny*.

between certain third-party suppliers and ***TDY Industries,*** a subsidiary of Allegheny and parent of ATI.  These agreements were all executed by Allegheny's officers.

121.     It was officers and employees of Allegheny, not ATI, who purported to calculate ATI's "variable costs" for purposes of an EFM analysis.  Such calculations were not based on ATI's own internal cost analysis.  Also, it was officers and employees of Allegheny, not ATI, who purported to prepare an "audit package" for the individual or firm who might theoretically audit ATI's EFM.  As shown above, it was an officer of Allegheny who groundlessly rejected US Mag's auditors.

122.     As mentioned above, on August 23, 2016, the Allegheny board of directors voted to idle the Rowley facility.  During this meeting, no employee of ATI was present.

123.     On information and belief, it was Allegheny's regular practice to unilaterally dictate the business decisions of ATI in such manner.

124.     REDACTED

125.     REDACTED

126. 

127.

128.    As set forth above, all "notices" under the S&O Agreement between US Mag and ATI were to be delivered to Allegheny headquarters in Pennsylvania.  Therefore, ATI and Allegheny had not only common officers, but common office space.  On information and belief, any Pennsylvania office space used for ATI was not leased, but was used in a shared, informal arrangement by individuals wearing the "hats" of both Allegheny and ATI.

129.    On information and belief, there were no written agreements governing the business relationship between ATI and Allegheny.

130.    Recall, Allegheny's Scott Rantovich provided a sworn statement that ATI kept "separate and independent" "financial records."  (¶ 113, *supra*.)  Taking Mr. Rantovich at his

word, US Mag requested that ATI produce its "financial statements for the past five years,

including, but not limited to, monthly and annual financial statements through 2016."  US Mag

also requested ATI's "annual financial statements, including profit and loss statements, income

statements, and balance sheets from September 1, 2006 to the present."

131.    In response to these requests, ATI pointed US Mag to certain "documents" that

had allegedly been produced "in their native form," "starting at document control number 1017."

Reviewing ATI's production, however, US Mag discovered that the document numbered "1017"

was a single Excel spreadsheet that had been created on ***March 6, <u>2018</u>*** – ***i.e., a document that***

***had been manufactured for this litigation***.[6]   In reviewing the rest of ATI's production, US Mag

further observed that the documents that followed "1017" were not ATI's financial statements,

balance sheets, or profit and loss statements.   In response to US Mag's inquiries, counsel for

ATI represented that document numbered 1017 was "the primary document responsive to your

request" and that ***"ATI had to generate a spreadsheet/report in order to provide the***

***information US Mag requested…"***  (Emphasis added.) ATI then referred US Mag to

*Allegheny's* consolidated financial statements.

132.    To date, apart from the document Bates numbered 1017, ATI has produced what

it characterizes as balance sheets, profit/loss statements or income statements for ATI.  However,

on information and belief, ATI did not prepare or maintain annual financial statements, balance

sheets, profit/loss statements, or income statements apart from the consolidated financial reports

prepared by and for Allegheny.  Moreover, as demonstrated by Allegheny's post-EFM

---

[6] Notably, ATI produced documents responsive to US Mag's discovery requests on March 19, 2018, about 11 days after document "1017" was first created.)

correspondence (¶ 98, *supra*), any financial records purporting to capture ATI's operations were kept at an Oregon facility owned by some entity other than ATI.

133.   REDACTED

. However, as set forth above (¶ 59), it was Allegheny that determined what would be "paid" to ATI for its titanium sponge, and therefore, it was Allegheny that unilaterally decided that ATI would incur losses instead of profits.  If ATI indeed operated at a "loss," Allegheny's allocation of "income" to ATI did not provide ATI enough to cover even ATI's costs of production.  This, despite substantial profits earned by Allegheny in its HPMC Section as a whole. (*See* ¶ 59, *supra*.)  On information and belief, Allegheny's officers and executives took substantial bonuses while depriving ATI of the necessary income to operate.

134.   Because ATI earned no "profits" and maintains no independent balance sheets or other financial statements, ATI would have no ability to show assets and liabilities, and therefore no ability to qualify for a loan or other outside capitalization, but would be entirely dependent on Allegheny for its funding.  Therefore, on information and belief, ATI has been and continues to be undercapitalized.

135.   REDACTED

136.   On information and belief, ATI's undercapitalization was a calculated maneuver by Allegheny, instigated at the inception of ATI, as an attempted means to avoid ATI's creditors, including US Mag, should Allegheny decide to shut down ATI's operations to earn greater profits elsewhere.

137.    As herein demonstrated, at all relevant times, there was such a unity of interest and ownership that the separate personalities of Allegheny and ATI did not exist and instead an alter ego or principal/agent relationship existed between the entities.  This involved, *inter alia*, commingling of business operations; common management and legal representation; sharing of headquarters and employees in Pittsburgh, Pennsylvania; non-arm's length transactions; consolidated summaries of operations and financial statements; absence of corporate records for ATI; a failure to follow corporate formalities on the part of ATI; and Allegheny's siphoning of funds from ATI, causing ATI to be and remain undercapitalized.

138.    To the extent that there were any conditions precedent to bringing this action, they have all occurred or have been performed.

## FIRST CLAIM FOR RELIEF
### (ANTICIPATORY & MATERIAL BREACH OF CONTRACT)

139.    US Mag incorporates by this reference the allegations set forth above as if fully set forth herein.

140.    In entering into the Exclusivity Agreement, Allegheny became legally bound to comply with both the express terms of the Exclusivity Agreement and the implied covenant of good faith and fair dealing.  Under this covenant of good faith, Allegheny impliedly promised not to do anything to injure US Mag's right to receive the benefits of the Exclusivity Agreement and to act consistently with the parties' agreed common purpose and US Mag's justified expectations.

141.    Such common purpose and US Mag's justified expectations were captured in the later-executed S&O Agreement between US Mag and ATI, which S&O Agreement expressly affirmed the "full force and effect" of the Exclusivity Agreement.  Whereas the S&O Agreement

required US Mag to provide molten magnesium to ATI, but the Exclusivity Agreement required US Mag to provide molten magnesium to no party other than Allegheny, all parties necessarily deemed ATI and Allegheny to be one and the same.

142.    In entering into the S&O Agreement, ATI became legally bound to comply with both the express terms of the S&O Agreement and also the implied covenant of good faith and fair dealing.  Under the implied covenant of good faith and fair dealing, ATI impliedly promised not to do anything to injure US Mag's right to receive the benefits of the S&O Agreement and to act consistently with the parties' agreed common purpose and US Mag's justified expectations.

143.    Allegheny and ATI materially breached the S&O Agreement and Exclusivity Agreement by the actions alleged herein.  Moreover, their actions alleged herein showed a positive and unequivocal intent not to render performance under the S&O Agreement, and constituted an anticipatory breach of the S&O Agreement.

144.    Allegheny and ATI materially breached the S&O Agreement, the Exclusivity Agreement, and the implied covenant of good faith and fair dealing by, *inter alia*, wrongfully declaring an Economic Force Majeure, unilaterally ceasing performance of their obligations under the S&O Agreement, and engaging in conduct having the purpose and effect of rendering futile US Mag's audit rights under the S&O Agreement.  Allegheny materially breached the Exclusivity Agreement and the implied covenant of good faith and fair dealing by engaging in conduct having the purpose and effect of destroying US Mag's justified expectations in entering into the Exclusivity Agreement.

145.     Under the S&O Agreement, US Mag was guaranteed that ATI would continue to perform its contractual obligations for at least 180 days after providing notice of an EFM, even assuming that the requirements of an EFM were satisfied.

146.     On information and belief, the requirements of an EFM were not satisfied and thus Allegheny and ATI improperly purported to give notice of an EFM on or about August 23, 2016.  ATI was therefore obligated to continue to perform its obligations under the S&O Agreement for the remainder of the term of the Agreement.

147.     In the alternative to the allegations in paragraph 146, on information and belief, the parties, if acting in accord with the S&O Agreement and with obligations of good faith and fair dealing under the S&O Agreement and the Exclusivity Agreement, would have negotiated revised pricing for US Mag's molten magnesium, in such a manner that the EFM would have been averted, and ATI would have been obligated to continue to perform its obligations under the S&O Agreement for the remainder of the S&O Agreement's term.

148.     In material breach of the S&O Agreement and the implied covenant of good faith and fair dealing, ATI, at Allegheny's direction, ceased performing its contractual obligations approximately one month after purporting to give notice of an EFM.

149.     As a result of ATI's and Allegheny's breaches of the S&O Agreement, the Exclusivity Agreement, and implied covenant of good faith and fair dealing, US Mag has suffered damages, including without limitation lost profits.

150.     US Mag fully performed its obligations under the S&O Agreement, the Exclusivity Agreement, and the implied covenant of good faith and fair dealing.

151.    Neither Allegheny nor ATI has any basis to assert that US Mag is in breach of any of the terms of the S&O Agreement, or the Exclusivity Agreement, or the implied covenant of good faith and fair dealing.

152.    US Mag is entitled to a judgment for its damages against ATI and Allegheny on account of their breaches of the S&O Agreement, breaches of the Exclusivity Agreement, breaches of the implied covenant of good faith and fair dealing, and the alter ego and principal/agent relationship that exists between ATI and Allegheny.  US Mag has suffered damages in the approximate range of $115 to $175 million.

## SECOND CLAIM FOR RELIEF
### (DECLARATORY JUDGMENT)

153.    US Mag incorporates by this reference the allegations set forth above as if fully set forth herein.

154.    An actual controversy has arisen and now exists between US Mag and Allegheny/ATI concerning their respective rights and duties in that US Mag contends that Allegheny/ATI has breached the S&O Agreement and the Exclusivity Agreement and that such breaches relieve US Mag of further performance under both contracts, whereas Allegheny and ATI dispute these contentions.

155.    A judicial declaration is necessary and appropriate at this time under the circumstances in order that US Mag may ascertain whether or not it is obligated to render further performance under the S&O Agreement and the Exclusivity Agreement.

156.    Allegheny's and ATI's acts and omissions constitute anticipatory and material breaches of the S&O Agreement and Exclusivity Agreement.

157.    In addition, Allegheny (through ATI) has failed to purchase 5,000 TPY of magnesium from US Mag for more than two consecutive calendar years.  (*See* Ex. B, Exclusivity Agreement, ¶ 5.)  Therefore, under the terms of the Exclusivity Agreement, US Mag is entitled to a judicial declaration that it is no longer bound to provide molten magnesium exclusively to Allegheny or its affiliates.

158.    US Mag is entitled to a judicial declaration that US Mag is relieved of further performance under the S&O Agreement and the Exclusivity Agreement.

## PRAYER FOR RELIEF

WHEREFORE, US Mag prays that a judgment be entered in favor of US Mag and against ATI and Allegheny, awarding US Mag the following:

1.    Damages in the approximate range of $115 million to $175 million.

2.    A judicial declaration that US Mag is relieved of further performance under the S&O Agreement and Exclusivity Agreement.

3.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

US Mag hereby demands a trial by jury on all issues triable thereto.

DATED this 22nd day of October, 2019.

BURBIDGE | MITCHELL

By _/s/ Richard D. Burbidge_____
*Attorneys for US Magnesium, LLC*

US MAGNESIUM, LLC,
vs.
ATI TITANIUM, LLC

United States District Court, District of Utah
Civil No. 2:17-cv-00923-DB  | District Judge Dee Benson

[*US MAGNESIUM, LLC'S AMENDED COMPLAINT*]

**INDEX OF EXHIBITS**

| Exhibit # | Description |
|-----------|-------------|
| A | Confidentiality Agreement (January 25, 2006) |
| B | Exclusivity Agreement (April 12, 2006) |
| C | Supply & Operating Agreement (September 1, 2006) |
| D | Amended Supply & Operating Agreement (January 31, 2014) |