IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

```
_____
                               )
US MAGNESIUM, LLC, a Delaware)
limited liability company,   )
                             )
     Plaintiff and           )
     Counterclaim Defendant, )   Civil No. 2:17-cv-00923-HCN-JCB
                             )
vs.                          )
                             )   Judge Howard C. Nielson, Jr.
ATI TITANIUM, LLC, a Delaware)
limited liability company;   )
ALLEGHENY TECHNOLOGIES,      )
INCORPORATED, a Delaware     )
corporation; and DOES 1-20,  )
                             )
     Defendants and          )
     Counterclaimant.        )
_____)
```

**ORAL RULING VIA ZOOM BEFORE THE**

**HONORABLE JUDGE HOWARD C. NIELSON, JR.**

Date:  Tuesday, August 17, 2021

Time:  3:00 p.m. to 4:00 p.m.

Reported by Teena Green, RPR, CRR, CBC
          United States Courthouse
          351 South West Temple, 7.430
          Salt Lake City, Utah   84101
          (801) 910-4092
          teena_green@utd.uscourts.gov

| 1 | **APPEARANCES** |
|---|---|
| 2 | FOR THE PLAINTIFF: |
| 3 | RICHARD BURBIDGE, ESQ. |
|   | CAROLYN LEDUC, ESQ. |
| 4 | BEAU BURBIDGE, ESQ. |
|   | BURBIDGE & MITCHELL |
| 5 | 215 South State Street, Suite 920 |
|   | Salt Lake City, Utah   84111 |
| 6 | (801) 355-6677 |
| 7 |  |
|   | FOR THE DEFENDANTS/COUNTERCLAIMANTS: |
| 8 |  |
|   | BRYON BENEVENTO, ESQ. |
| 9 | ADAM C. BUCK, ESQ. |
|   | KIMBERLY NEVILLE, ESQ. |
| 10 | DORSEY & WHITNEY LLP |
|   | 111 S. Main Street Suite 2100 |
| 11 | Salt Lake City, Utah   84111-2176 |
|   | (801) 933-7360 |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

```
1   August 17, 2021                                    3:00 p.m.
2                        P R O C E E D I N G S
3         THE COURT:  Good afternoon.  We're here for a video
4   hearing in US Magnesium versus ATI Titanium, et al.,
5   Case No. 2:17-cv-923.
6            The purpose of this hearing is for me to issue
7   rulings on Docket No. 314, Defendant Allegheny Technologies'
8   Motion for Summary Judgment; Docket No. 317, Defendant
9   ATI Titanium's Motion for Partial Summary Judgment; Docket
10  No. 321, Plaintiff's Motion for Partial Summary Judgment on
11  ATI's Counterclaim; Docket No. 408, Plaintiff's Objection to
12  Magistrate Ruling; and Docket No. 411, Plaintiff's Objection to
13  Magistrate Ruling.
14           I would also like to discuss trial logistics
15  consistent with Docket No. 416, Plaintiff's Request for a Trial
16  Setting Conference.
17           We will begin with appearances of counsel.  First,
18  counsel for plaintiffs.
19        MR. BURBIDGE:  Good afternoon, Your Honor.  Richard
20  Burbidge, Carolyn LeDuc, Beau Burbidge, representing
21  US Magnesium.
22        THE COURT:  Thank you.  Welcome, both of you.
23        MR. BURBIDGE:  Thank you.
24        THE COURT:  And counsel for defendants?
25        MR. BENEVENTO:  Good afternoon, Your Honor.  Bryon
```

1    Benevento, Kim Neville and Adam Buck, on behalf of

2    ATI Titanium, LLC and Allegheny Technologies, Incorporated.

3              **THE COURT:**  All right.  Welcome all of you.

4              So to be clear, you represent both defendants;

5    correct?

6              **MR. BENEVENTO:**  Yes, sir.

7              **THE COURT:**  All right.

8              Is there anyone else who needs to enter an

9    appearance?  Most of the people I see are court personnel, but

10   are there any other lawyers on the call?

11             **MR. BENEVENTO:**  On behalf of the defendant, we have

12   our in-house counsel in Pittsburgh, Pennsylvania, on the phone.

13             **THE COURT:**  All right.  Very well.

14             All right.  Thank you.

15             Now, because we're holding this hearing by

16   videoconference, we all need to help the reporter create an

17   accurate transcript.

18             First, please speak slowly and clearly.

19             Second, please identify yourself whenever you begin

20   speaking unless it's clear from context who is talking.

21             Third, please do not speak over each other or

22   interrupt and please speak only when directed to.

23             And finally, please put your microphone on mute when

24   you're not speaking, to reduce background noise.

25             Thank you.

1          All right.  I will now rule on the pending motions.

2          We are on the record, and the transcript of my oral

3    rulings will serve as my opinion on the motions.  That is,

4    although my courtroom deputy will enter a minute order stating

5    the disposition of the motions, there will not be a written

6    opinion.

7          I will begin by addressing the legal standard that

8    governs the parties' motions for summary judgment, Docket

9    Nos. 314, 317 and 321.

10          Pursuant to Federal Rule of Civil Procedure 56,

11    "[t]he court shall grant summary judgment if the movant shows

12    that there is no genuine dispute as to any material fact and

13    the movant is entitled to judgment as a matter of law.

14          Material facts are those which "might affect the

15    outcome of the suit under the governing law."  I'm quoting

16    there from *Anderson versus Liberty Lobby, Incorporated*, 477

17    U.S. 242 at page 248 from 1986.

18          A "dispute about a material fact is 'genuine'...if

19    the evidence is such that a reasonable jury could return a

20    verdict for the nonmoving party."  That's from the same source.

21          "[C]ourts are required to view the facts and draw

22    reasonable inferences in the light most favorable to the party

23    opposing the summary judgment motion."  I'm quoting there from

24    *Scott versus Harris*, 550 U.S. 372 at page 378 from 2007.

25          All right.  With that, I will address Docket No. 314,

1   Defendant Allegheny Technologies Incorporated's Motion for
2   Summary Judgment.
3           Throughout my rulings today, I will refer to this
4   Defendant as "Allegheny" and I will refer to ATI Titanium as
5   "ATI."
6           Allegheny argues that summary judgment should be
7   granted in its favor because "US Magnesium has failed to
8   establish the necessary elements of its alter ego and breach of
9   contract claim against this defendant."  I'm quoting there from
10  Docket No. 314 at 7.
11          I will first address the alter ego issue.
12          It is well settled that "[u]nder ordinary
13  circumstances, a parent corporation will not be held liable for
14  the obligations of its subsidiary."  I'm quoting there from
15  *Mobil Oil Corporation versus Linear Films, Incorporated*, 718 F.
16  Supp. 260 at page 270, from the District of Delaware in 1989.
17          Under Delaware law, the corporate veil may be
18  pierced, however, "where there is fraud or where [the
19  corporation] is in fact a mere instrumentality or alter ego of
20  its owner."  That's a quote from *NetJets Aviation, Incorporated*
21  *versus LHC Communications, LLC*, 537 F.3d 168 at page 176, from
22  the Second Circuit in 2008.
23          In this case, Plaintiff alleges that ATI is the mere
24  "alter ego" of Allegheny.
25          But "[p]ersuading a Delaware court to disregard the

1    corporate entity is a difficult task, and the party who wishes

2    the court to disregard that form bears the burden of proving

3    that there are substantial reasons for doing so."  That's a

4    quote from *In Re Opus East, LLC*, 528 Bankruptcy Reporter 30, 57

5    to 58, from the Bankruptcy Court of the District of Delaware in

6    2015.

7            And courts are especially unlikely to pierce the

8    corporate veil in contract cases because the plaintiff chose

9    with whom to contract.  See, for example, *Cascade Energy and*

10   *Metals Corporation versus Banks*, 896 F.2d 1557 at page 1577

11   from the Tenth Circuit in 1990.

12           In order "[t]o prevail under the alter-ego theory of

13   piercing the veil, a plaintiff...must show a mingling of the

14   operations of the entity and its owner plus an overall element

15   of injustice or unfairness."  That's a quote from *NetJets* at

16   page 176.

17           Determining whether a subsidiary is an alter ego of

18   the parent is a fact-intensive inquiry, with numerous factors

19   that "cannot be reduced to a single formula."  That's *NetJets*

20   at page 177.

21           There is "no single factor" that "c[an] justify a

22   decision to disregard the corporate entity, but...some

23   combination of them [i]s required."  That's a quote from the

24   same page of *NetJets*.

25           Some factors to consider include "whether the

1    corporation was adequately capitalized for the corporate

2    undertaking; whether the corporation was solvent; whether

3    dividends were paid, corporate records kept, officers and

4    directors functioned properly, and other corporate formalities

5    were observed; whether the dominant shareholder siphoned

6    corporate funds; and whether, in general, the corporation

7    simply functioned as a facade for the dominant shareholder."

8    And that's *NetJets* at page 177.

9           And while these factors were developed in cases

10   involving corporations, they are also "generally applicable as

11   well where one of the entities in question is an LLC rather

12   than a corporation," as ATI is in this case.  And that's from

13   *NetJets* at 178.

14          After carefully reviewing the briefing and evidence,

15   I conclude that Allegheny has established as a matter of law

16   that piercing the corporate veil is not appropriate here.

17          I first consider "whether the corporation was

18   adequately capitalized for the corporate undertaking."

19          I conclude that there is no genuine dispute that it

20   was.

21          To be sure, ATI does not have, and appears never to

22   have had, significant funds in its bank account.

23          But bank deposits are only one type of asset.

24          When ATI was established, the real property on which

25   the manufacturing plant is located, the manufacturing plant

1    itself and other improvements to the property were all titled

2    to ATI.

3           At that time, the manufacturing plant alone was

4    determined to be worth $500 million.  That's from Docket

5    No. 314-5 at paragraph 3.

6           And these valuable assets continue to appear on ATI's

7    balance sheet.

8           In addition, ATI owns rights in a joint venture with

9    US Magnesium, Skull Valley Water Group, LLC, which was formed

10   to hold water rights and oversee improvements pertaining to

11   water use on the parties' properties.  That's Docket No. 321-2,

12   which I will call the "S&O Agreement," at 18 Section 7.4.

13          If ATI had been able to make a profit selling

14   titanium sponge at market price, it would no doubt have

15   additional assets on its balance sheet.

16          It appears, however, that its costs of production

17   consistently exceeded the market price.

18          Given that these assets remain on the balance sheet

19   of ATI, it also appears that there is no evidence that could

20   support a finding of insolvency here.

21          I next consider whether corporate formalities were

22   observed.

23          Defendants present evidence that:  1) ATI kept books

24   and records that were subject to regular audits; 2) ATI hosted

25   an annual meeting and kept minutes of that meeting as required

1   by Delaware law; and 3) ATI appointed a slate of officers who

2   governed the entity.

3          US Magnesium, however, counters that 1) ATI's

4   officers were all officers and legal staff of Allegheny, and 2)

5   ATI produced almost no meeting minutes.

6          There is nothing unlawful or improper about either of

7   these things, however.

8          In all events, although the evidence strongly

9   supports Defendants' position that ATI observed required

10  formalities, the Delaware courts have made clear that "[i]n the

11  alter-ego analysis of an LLC, somewhat less emphasis is placed

12  on whether the LLC observed internal formalities because fewer

13  such formalities are legally required."  That's from *NetJets* at

14  page 178.

15         I next consider whether "the dominant shareholder

16  siphoned corporate funds."

17         I conclude that there is no genuine dispute that it

18  did not.

19         US Magnesium is correct that Allegheny did not pay

20  ATI in cash for the titanium sponge it received from ATI, that

21  Allegheny generally paid ATI's bills, that ATI does not appear

22  to have ever made meaningful use of its independent bank

23  account, and that Allegheny's accounting personnel kept all of

24  ATI's financial records.

25         But all of this is explained by Allegheny's

1  consolidated reporting.

2         As Defendants explain, ATI was credited for all

3  inter-company transfers of titanium sponge at the market price

4  as required by accounting principles.

5         As Defendants also explain, when Allegheny paid ATI's

6  bills, the payments were debited from ATI Titanium's balance

7  sheets and, when debits exceeded credits, as was often the

8  case, the excess was treated as an additional infusion of

9  equity.

10        There is nothing improper or particularly unusual

11  about any of this.

12        And after carefully reviewing the evidence identified

13  by the parties, including Docket No. 316-3, ATI's Financial

14  Analysis Summary, I conclude that the evidence clearly supports

15  Defendants' explanation of how the transactions between ATI and

16  Allegheny were accounted for and that there is no factual basis

17  for questioning this explanation or that the accounting was

18  handled appropriately.

19        Further, as Defendants concede, regardless of

20  Allegheny's consolidated accounting, all of ATI's assets, as

21  reflected on its balance sheet, would be available to a

22  judgment creditor.

23        Finally, considering everything I have discussed, as

24  well as the parties' other arguments and evidence, I conclude

25  that US Magnesium has failed to identify evidence that could

1  support a reasonable conclusion that "in general, [ATI] simply

2  functioned as a facade for [Allegheny]."

3  More important still, viewing the evidence in the

4  manner most favorable to US Magnesium, I conclude that US

5  Magnesium has failed to provide any basis for a conclusion that

6  there would be an "overall element of injustice or unfairness"

7  in limiting its redress to ATI, the party with which it chose

8  to contract.

9  Simply put, ATI was adequately capitalized and,

10  although its production of titanium sponge has not been

11  profitable, Allegheny has not siphoned funds from ATI and ATI

12  retains substantial assets.  If US Magnesium wanted Allegheny

13  to be a surety for ATI's performance, it could have insisted

14  that the Supply & Operating Agreement be structured in that

15  manner.

16  For all of these reasons, I conclude that, even

17  viewing the evidence in the manner most favorable to

18  US Magnesium, US Magnesium has failed to identify anything that

19  could meet the demanding showing required by Delaware law for

20  piercing the corporate veil, especially in a contract case.

21  Allegheny is accordingly entitled to summary judgment

22  on US Magnesium's claim that ATI is Allegheny's alter ego.

23  Plaintiff next argues that because "Allegheny

24  exercised complete control over all aspects of ATI-Ti's

25  commercial relationships with all third parties, including with

1   US Mag," and that's a quote, Allegheny can be held liable for

2   ATI's alleged breach of contract on an agency theory.  That's

3   from Docket No. 369 at 35.

4           The Supply & Operating Agreement, however, explicitly

5   defines the parties to the contract as "ATI Titanium LLC...and

6   US Magnesium, LLC."  And that's the S&O Agreement at 2.

7           Not only is Allegheny not included in this

8   definition, it is covered by a separate definition: "ATI means

9   Allegheny Technologies Incorporated, a Delaware corporation."

10  And that's the same agreement at page 3.

11          It is thus clear that Allegheny is not a party to the

12  Supply & Operating Agreement.

13          And Section 13.2 of the Agreement states that the

14  contract "will inure to the benefit of, and be binding upon,

15  the parties hereto" and "will have no third-party

16  beneficiaries."  That's the Agreement at page 28.

17          Additionally, even if there were an agency

18  relationship between Allegheny and ATI, "[it] is hornbook law

19  that, ordinarily, only parties to a contract may be liable for

20  breach of that contract," that "[a]gency law does not negate or

21  otherwise alter that fundamental tenet of contract law," and

22  that "the law will not impose vicarious liability upon the

23  principal for its agent's non-tortious breach of [a] contract"

24  to which the agent, and not the principal, is a party.  I'm

25  quoting most of that from *Wenske versus Blue Bell Creameries,*

1    *Incorporated*, 2018 Delaware Chancery LEXIS 530 at *6 from the

2    Delaware Chancery Court November 13, 2018.

3            For all of these reasons, US Magnesium's agency

4    theory fails.

5            Finally, US Magnesium asserts a breach of contract

6    claim against Defendant Allegheny, arguing that "when Allegheny

7    caused ATI-Ti to breach the S&O Agreement, this was a breach of

8    good faith under the integrated Exclusivity Agreement."  That's

9    Docket No. 369 at 36 that I'm quoting from.

10           But "US Magnesium is not seeking damages specific to

11   this breach, aside from damages under alter ego and agency

12   theories of liability."  And that again is a quote.  Instead,

13   "US Mag [seeks] a ruling that it was Allegheny's breach, and

14   not US Mag's own, that terminated the Exclusivity Agreement."

15   And that's Docket 369 at 38.

16           Candidly, I am not quite sure what to make of US

17   Magnesium's argument, but I cannot see any merit in it.

18           The Exclusivity Agreement was an agreement between

19   Allegheny and US Magnesium that predated the S&O Agreement

20   between ATI and US Magnesium.

21           And US Magnesium has not alleged that Allegheny

22   violated any of the explicit provisions of the Exclusivity

23   Agreement.

24           Additionally, the language of the Supply and

25   Operating Agreement is clear that, "the parties hereby agree

1  and acknowledge that the Agreement between Allegheny

2  Technologies Incorporated and Seller dated April 12, 2006 [the

3  "Exclusivity Agreement"] is in no way merged into, modified by,

4  or cancelled by this Agreement, and that the April 12, 2006

5  Agreement, including, without limitation, Section 5 thereof,

6  survives in full force and effect."  And that's the S&O

7  Agreement at 29, Section 13.5.

8            In light of this provision, I do not see how

9  US Magnesium can bootstrap a claim for breach of the S&O

10 Agreement into a claim for breach of the Exclusivity Agreement.

11           The Exclusivity Agreement is a separate contract, and

12 a breach of that contract, separate and apart from a breach of

13 the Supply & Operating Agreement, must be alleged.

14           Because Plaintiff has failed to allege any breach of

15 the Exclusivity Agreement, I conclude that its breach of

16 contract claim fails.

17           For the foregoing reasons, Plaintiff's claims against

18 Allegheny Technologies fail.

19           And Docket No. 314, Allegheny's Motion for Summary

20 Judgment, is granted.

21           I will next turn to Docket No. 317, ATI's Motion for

22 Partial Summary Judgment.

23           This is not a typical summary judgment motion.  ATI

24 is not asking for judgment on any specific claims; rather, it

25 asks the court to make four specific legal rulings.

1       I will address each requested ruling in turn.

2       First, ATI requests a ruling that "[t]he September 1,

3   2006 Supply & Operating Agreement is the governing contract in

4   this dispute, as any 'lease' agreement has been rescinded by

5   the parties through a subsequent written amendment."  That's

6   Docket No. 317 at page 6.

7       While the parties did enter into a lease agreement on

8   January 31, 2015, you can see that at Docket No. 317-3 at 21,

9   there is no dispute between the parties that this agreement is

10  no longer in force, and that is plainly correct.

11      To the extent that ATI simply requests a ruling that

12  the lease agreement has been rescinded and is no longer in

13  force, I thus grant its motion on this issue.

14      It does not follow, however, that the lease agreement

15  cannot be used as extrinsic evidence to the extent that there

16  are any ambiguities in the S&O Agreement that warrant

17  consideration of extrinsic evidence.

18      Second, ATI requests a ruling that "[t]he plain

19  language of the Supply & Operating Agreement allows ATI to

20  purchase solid magnesium."  That's Docket No. 317 at 6.

21      I agree with that reading of the Agreement.

22      The Supply & Operating Agreement states that "[f]rom

23  time to time on and after the Effective Date, and subject to

24  the other provisions of this Agreement, Seller will sell to

25  Buyer, and Buyer will purchase from Seller, Magnesium produced

1    at the Magnesium Production Facility in exchange for the

2    purchase prices set forth in Schedule 2:1 hereof."  And that's

3    S&O Agreement Section 2.1 at page 6.

4            The schedule includes prices for both molten and

5    solid magnesium.  We can see that just by looking at Schedule

6    2.1 at page 36.

7            The contract further specifies that "[a]ll Magnesium

8    supplied by Seller to Buyer under this Agreement will be in

9    molten form, unless Buyer specifies that it would like to

10   receive Solid Magnesium, in which case Buyer will specify the

11   number of pounds of Solid Magnesium that it desires to receive

12   and the time(s) when it desires to receive it."  That's the S&O

13   Agreement at page 10, Section 3.2(c).

14           The Supply & Operating Agreement therefore clearly

15   and unambiguously gives ATI the right to purchase solid

16   magnesium.

17           Utah law is clear that this right must be exercised

18   in good faith, however.

19           The Utah Supreme Court has made clear that "[a]n

20   implied covenant of good faith and fair dealing inheres in

21   every contract."  I'm quoting there from *Eggett versus Wasatch*

22   *Energy Corporation*, 94 Pacific 3d 193 at page 197 from the Utah

23   Supreme Court in 2004.  Under this covenant, "both parties to a

24   contract impliedly promise not to intentionally do anything to

25   injure the other party's right to receive the benefits of the

1   contract."  And that's a quote from the same page of *Eggett*.

2           Furthermore, under Utah law, "the degree to which a

3   party to a contract may invoke the protections of the covenant

4   turns on the extent to which the contracting parties have

5   defined their expectations and imposed limitations on contract

6   terms."  That's from *Eggett* at page 198.

7           "Broadly speaking, the more leeway a party has under

8   the terms of the contract, the more contracting parties may

9   invoke the protections of the covenant of good faith and fair

10  dealing in the exercise of that discretion."  That's also

11  *Eggett* at page 198.

12          It follows that "[t]he covenant has an important role

13  to play when the terms of the contract leave the very existence

14  of the right...in the sole and undefined discretion of one

15  party.  In such situations, the covenant requires that the

16  party possessing such discretion exercise it in a good faith,

17  objectively reasonable manner."  That's *Backbone Worldwide*

18  *Incorporated versus LifeVantage Corporation*, 443 Pacific 3d 780

19  at page 785 from the Utah Court of Appeals in 2019.

20          "These situations necessarily involve contracts that

21  do not impose definitional limits on the party's exercise of

22  discretion, and therefore implying 'good faith' or

23  'reasonableness' requirements through the covenant is not at

24  all inconsistent with any express contractual terms."  That's

25  also from the same page of *Backbone Worldwide*.

1    Here, the Supply & Operating Agreement does not

2    define or impose express limits on ATI's right to purchase

3    solid magnesium.  Rather, it appears to leave that right to

4    ATI's sole discretion.  It follows that under the implied

5    covenant of good faith and fair dealing, ATI must exercise its

6    discretion "in a good faith, objectively reasonable manner."

7    My ruling that the Supply & Operating Agreement

8    clearly permitted ATI to purchase solid magnesium thus does not

9    foreclose US Magnesium from seeking to establish that ATI's

10   request for solid magnesium breached the implied covenant of

11   good faith and fair dealing.

12   Third, ATI requests a ruling that "[t]he Supply &

13   Operating Agreement does not require ATI to continuously

14   operate its facility."  Again, that's Docket No. 317 at page 6.

15   I conclude that the Supply & Operating Agreement is

16   clearly not written or structured to require continuous

17   operations.

18   To be sure, the contract is a twenty-year contract

19   that can only be terminated in specific ways.  We can see that

20   just from various provisions of the Agreement, Sections 9.1,

21   9.2, 9.3 at pages 22 to 23.

22   But neither the structure nor the plain language of

23   the Agreement requires ATI to continuously operate its

24   facility.  Rather, the contract is structured to require ATI to

25   make annual minimum orders of magnesium from US Magnesium.  We

1    can see that at the S&O Agreement at Sections 3.2 and 3.4 at

2    pages 11 to 12.

3            As explained, the Agreement allows ATI to meet its

4    minimum orders, at least in part, with solid, as opposed to

5    molten magnesium, which supports an inference that ATI is

6    permitted to purchase magnesium for future, as opposed to

7    immediate, use.

8            And ATI is only required to return magnesium chloride

9    to US Magnesium as it is available, not in any certain or

10   defined amount.  That's the S&O Agreement at Section 3.6 at 12.

11           The contract thus provides ATI leeway to return less

12   magnesium chloride than would be produced if its facility was

13   operated continuously.

14           I can thus find nothing in the Agreement that

15   expressly or impliedly requires ATI to continuously operate its

16   facility.  And the provisions of the Agreement that I have just

17   discussed clearly support the inference that ATI is not

18   required to continuously operate its facility as long as it

19   makes the required minimum purchases.

20           Finally, ATI asks for a ruling that "[t]he Supply &

21   Operating Agreement does not contain a right of first refusal

22   or any provision that would allow US Mag to match ATI's costs

23   in order to avert an economic force majeure."  And that's

24   Docket No. 317 at 6 again.

25           I agree with that reading of the Agreement.

1    The contract says only that there is a duty to
2  negotiate in good faith.  That's the S&O Agreement, Section
3  11.2 at 26.  It says nothing about a right of first refusal or
4  a right to match ATI's costs in order to avert an economic
5  force majeure.
6    But while ATI may not have been required by the
7  contract to give US Magnesium insights into its fixed costs as
8  would be the case if US Magnesium had a contractual right of
9  first refusal or a right to match ATI's costs, US Magnesium
10  remains free to argue that ATI's refusal to give US Magnesium
11  any insight into ATI's fixed costs is evidence that ATI was not
12  negotiating in good faith.
13    Because I agree with ATI on each of the legal issues
14  it has raised, subject to the important caveats I have
15  discussed, Docket No. 317, ATI's Motion for Partial Summary
16  Judgment, is granted.
17    I will next address Docket No. 321, US Magnesium's
18  Motion for Partial Summary Judgment on ATI's Counterclaim.
19    US Magnesium requests a ruling that "as a matter of
20  law, ATI cannot demonstrate damages under its Counterclaim."
21  That's Docket No. 321 at 2.
22    ATI seeks consequential damages related to the
23  shut-down of its facility for manufacturing titanium sponge.
24    To recover consequential damages, a party generally
25  must show that the consequential damages it seeks could not

1    have been mitigated by cover.

2         ATI claims that US Magnesium has the burden of proof

3    regarding cover.  But that is not true under Utah law.  We can

4    see that from *Ohline Corporation versus Granite Mill*, 849

5    Pacific 2d 602 at page 605 from the Utah Court of Appeals in

6    1993.

7         Utah law provides that "[c]onsequential damages

8    resulting from the seller's breach include any loss resulting

9    from general or particular requirements and needs of which the

10   seller at the time of contracting had reason to know and which

11   could not reasonably be prevented by cover or otherwise."

12   That's Utah Code Section 70A-2-715.

13        As Comment 2 to this provision explains,

14   "Subparagraph (2) carries forward the provisions of the prior

15   uniform statutory provision as to consequential damages

16   resulting from breach of warranty, but modifies the rule by

17   requiring first that the buyer attempt to minimize his damages

18   in good faith, either by cover or otherwise."  And again,

19   that's comment 2 to Utah Code 70A-2-715.

20        ATI asserts that its consequential damages could not

21   have reasonably been prevented by cover given the state of the

22   magnesium market at the time.

23        In particular, ATI maintains that it could not have

24   obtained magnesium from other sources at a lower price than

25   offered by US Magnesium.

1       The only evidence in the record that ATI offers in

2 support of this argument, however, is a brief that US Magnesium

3 wrote and sent to the US Department of Commerce and Senator

4 Orrin Hatch describing the conditions of the magnesium market

5 and a transcript of a proceeding before the ITC regarding

6 Israeli magnesium.

7       But these documents do not support the conclusion

8 that reasonable cover would have been impossible to obtain.

9       To be sure, these documents support an inference that

10 Chinese magnesium was not available as reasonable cover given

11 the countervailing duties imposed on magnesium imported from

12 China.

13       But these documents also make clear that magnesium

14 imported from other countries, specifically Turkey and Russia,

15 was available in the United States at prices below those

16 offered by domestic producers.  And they suggest that magnesium

17 from Israel may have been available at a lower price as well.

18       I conclude that a reasonable jury could not conclude

19 from these documents that reasonable cover was impossible to

20 obtain. Indeed, the documents suggest the opposite, that

21 reasonable cover may have been available from Russian, Turkish,

22 and possibly Israeli magnesium producers.

23       In addition, ATI claims that reasonable cover was not

24 available because they could not obtain molten magnesium from

25 any other source.  That's Docket No. 365 at page 36, note 5.

1    As already shown, however, the Supply & Operating

2    Agreement contemplated that ATI could order solid magnesium and

3    there is no dispute that ATI could use solid magnesium to

4    produce titanium sponge if necessary.

5    Because ATI has failed to provide evidence supporting

6    its argument that the consequential damages it seeks to recover

7    could not have been mitigated by cover, I conclude that it is

8    not entitled to recover these consequential damages.

9    For the foregoing reasons, Docket No. 321,

10   US Magnesium's Motion for Partial Summary Judgment on ATI's

11   Counterclaim, is granted.

12   I will next address Docket Nos. 408 and 411,

13   US Magnesium's objections to Docket No. 404, Magistrate Judge

14   Bennett's rulings on the Daubert motions.

15   Under Federal Rule of Civil Procedure 72a, I "must

16   consider timely objections and modify or set aside any part of

17   the order that is clearly erroneous or is contrary to law."

18   I will first turn to Docket No. 408.

19   I overrule the objection for the following reasons.

20   The Supply & Operating Agreement has an Economic

21   Force Majeure Clause, which the parties call the "EFM clause,"

22   that allows ATI to suspend its performance if it obtains offers

23   that would allow it to obtain titanium sponge for a period of

24   at least 5 years at a price "at or below 85 percent of its

25   variable costs to produce titanium sponge at the Titanium

1    Sponge Plant."  And that's the S&O Agreement, Section 11.2(a)
2    at 26.
3            But surely ATI's own classifications of its costs are
4    not conclusive on whether this clause was properly invoked.
5    ATI could not, for example, properly invoke the EFM clause by
6    classifying all of its costs as variable rather than fixed.
7            Thus, even if ATI's own classification of costs as
8    fixed or variable supported invocation of the EFM clause,
9    US Magnesium would no doubt be free to argue that the EFM
10   clause was not properly invoked because ATI's costs were not
11   properly classified and that ATI was not in fact able to obtain
12   titanium sponge at a price at or below 85 percent of its
13   "properly classified" variable costs.
14           Indeed, the Supply & Operating Agreement has a
15   provision that allows US Magnesium to have an auditor examine
16   whether the economic force majeure clause had been properly
17   invoked.  And that's Section 11.3 at page 26 of the S&O
18   Agreement.  Nothing in this provision suggests, and it is
19   difficult to imagine that the parties intended, that this
20   auditor would be bound by how ATI classified its costs in
21   determining whether ATI was in fact able to obtain titanium
22   sponge for five years at a price at or below 85 percent of its
23   variable costs.
24           It follows from this that ATI's expert also is not
25   bound by how ATI classified its costs.  Rather, ATI may present

1   testimony that the EFM was appropriately invoked based on an

2   objectively proper classification of costs.

3          Finally, ATI has presented evidence that the concepts

4   of "linear variable" and "non-linear variable" costs are

5   established in the relevant scientific literature.  I thus

6   cannot say that Mr. Stranton's reliance on these concepts in

7   classifying ATI's costs is scientifically unacceptable.

8          Nor do I see anything in the contract that bars

9   classification of fixed costs in this manner.

10          For all of these reasons, I cannot say that Judge

11   Bennett's order was "clearly erroneous or contrary to law."

12          Docket No. 408, Plaintiff's Objection to the

13   Magistrate's Ruling, is accordingly overruled.

14          Finally, I will address Docket No. 411.

15          While this objection asks me to "revisit the issues

16   raised in US Mag's Motion and hold that Mr. Nelson's legally

17   erroneous opinions should be excluded from trial," that's

18   Docket No. 428 at 11, US Magnesium represents that it "does not

19   oppose this Court deferring any decision on these issues until

20   later in these proceedings, presumably in connection with

21   pre-trial motion practice.  US Mag submits this Objection to

22   make clear on the record that these issues, summarized for the

23   Court below, have been raised but have not been ruled on.

24   US Mag does not waive its right to re-assert these undecided

25   issues as part of motions in limine, as part of arguments in

1    respect of jury instructions, or in some other manner."  And

2    that's Docket No. 411 at 3.

3          Fair enough, but that is no basis for reversing Judge

4    Bennett's ruling as clearly erroneous or contrary to law.

5          So to the extent that it even is an objection,

6    Docket No. 411 is accordingly overruled.

7          In summary:

8          Docket No. 314, Allegheny's Motion for Summary

9    Judgment, is granted;

10         Docket No. 317, ATI's Motion for Partial Summary

11    Judgment, is granted;

12         Docket No. 321, US Magnesium's Motion for Partial

13    Summary Judgment on ATI's Counterclaim, is granted;

14         Docket No. 408, US Magnesium's Objection to the

15    Magistrate's Ruling, is overruled;

16         And Docket No. 411, US Magnesium's Objection to the

17    Magistrate's Ruling, is overruled.

18         It is so ordered.

19         All right.  That's probably a fair amount to process

20    and I'm sure you may want to review the transcript, but are

21    there any questions right now about the ruling?

22         **MR. BURBIDGE:**  No, Your Honor.

23         **MR. BENEVENTO:**  No, Your Honor.

24         **THE COURT:**  All right.  Very well.  Now, of course

25    that doesn't dispose of the case, so it may narrow some of the

1    issues.  So now that we've addressed the summary judgment

2    motions and the objections, let's turn to Docket No. 416,

3    Plaintiff's Request for a Trial Setting Conference.

4              I believe we may have discussed some of this before

5    so I may be repeating myself, but please bear with me.

6              The court has recently resumed criminal jury trials.

7    As a constitutional matter, we are required to give precedence

8    to criminal trials over civil trials so we are scheduling those

9    first, and at least for now the entire court is holding only

10   one criminal trial at a time.  So I'm not yet in a position

11   where I believe I can set firm dates for civil jury trials,

12   with one important caveat.  As defendants plead guilty and so

13   forth, we might be able to hold some civil trials fairly soon,

14   though probably on short notice.

15             I am going to ask a number of questions.  And to the

16   extent you don't know the answers today, that's fine.  You may

17   submit a status report no later than 30 days from now

18   addressing these issues.  But, you know, to the extent you may

19   have thoughts about them now, though, I'd like to hear them.

20             First, would it make sense for the parties to engage

21   in any further settlement negotiations or mediation in light of

22   my ruling today?

23             **MR. BURBIDGE:**  From the plaintiff's point of view,

24   we've never rejected settlement discussions.  The only ones

25   that have occurred, occurred early on before really anybody

1  knew much about the case.  So I can't say they would not be

2  helpful, nor would I suggest that we would not participate in

3  good faith.

4        THE COURT:  All right.  Mr. Benevento, do you have

5  thoughts about that?

6        MR. BENEVENTO:  Certainly.  We've extended a couple

7  of invitations to mediate.  We haven't received a favorable

8  response to that.  We remain willing to mediate.

9        THE COURT:  All right.  Would the parties be

10  interested in -- for example, it's not uncommon for us to refer

11  a case to one of our magistrate judges for mediation.

12        Is that something that would be of interest to the

13  parties?

14        MR. BURBIDGE:  Your Honor, from the plaintiff's point

15  of view, we've had more success with outside mediators.  I had

16  some experience in California that was favorable, but here I

17  would prefer to select an outside mediator.  Typically, they

18  will stay on the case, put more time in without having to

19  juggle their already busy trial and hearing schedules.  So

20  that's just my experience, Your Honor.

21        THE COURT:  All right.  Mr. Benevento, do you have

22  thoughts about that?

23        MR. BENEVENTO:  I do not disagree with the plaintiff.

24        THE COURT:  All right.  Should I try and establish

25  some formal mediation structure or requirement, or is that

1    something the parties would prefer that I just leave in your

2    hands to try and work through?

3              MR. BURBIDGE:   I think that's something you can leave

4    in our hands, but I wouldn't oppose -- if the court wants any

5    date on which it will have occurred, I don't have an issue with

6    that.

7              THE COURT:   Mr. Benevento?

8              MR. BENEVENTO:   I would appreciate a date.

9              THE COURT:   Okay.   All right.   I'll give that some

10   thought.   So maybe -- and especially since its likely that

11   we're not going to be able to have trial immediately given

12   that, unfortunately, the pandemic is proving harder to shake

13   than we'd hoped.   But especially given that there may be a

14   delay in getting the trial, it seems like we could put that

15   time to good use, possibly, if the parties were willing and

16   able to engage in mediation or something.   You know, maybe we

17   can settle the case or narrow it somehow.

18             So what would be an appropriate date?   Do the two of

19   you have thoughts about that?

20             MR. BURBIDGE:   Well, from the plaintiff's point of

21   view, I'm always optimistic, but I do understand the Court's

22   conflicts with the criminal docket.   And we would, by the way,

23   be willing to respond fairly quickly if a date opened.

24             Can I just inquire, Your Honor, without being

25   presumptuous?

1          **THE COURT:**  Yeah.

2          **MR. BURBIDGE:**  Do you have some sense of when

3   civil -- and we're looking at a trial of two to three weeks --

4   a civil trial could potentially have some opportunity to be

5   tried?

6          **THE COURT:**  You know, it's hard to say for sure.  I

7   was hopeful that we'd be in a position to be having multiple

8   trials at a time by the fall, this fall, but that does not look

9   likely now.  I mean maybe next year would be when we start.

10         You know, once we have -- right now, while we're

11  doing one trial at a time, there are -- you know, we sometimes

12  are able to get civil trials in if there's a date and there's

13  no criminal case ready to go.  And that has happened once or

14  twice, though, as I said, it's oftentimes on short notice.  But

15  if there is a criminal case available, we have to do that

16  first.

17         Once we start having multiple trials at a time, then

18  I think we'll have more flexibility.  I think it's very

19  unlikely that I could -- that I will be able to hold civil jury

20  trials before the spring.  And even then, I have to tell you,

21  Mr. Burbidge, you're about No. 12 in line at this point.  I

22  have a lot of civil trials that are backed up.

23         And, you know, that's not an inflexible list.  You

24  know, different cases move at different speeds.  In addition to

25  when the summary judgment motions have been resolved, I also

1     look at how old the case is.  This is an older case, so that

2     might move you up that queue a little bit but, unfortunately,

3     this is not at or even really near the top of the queue for my

4     civil jury cases.

5             **MR. BURBIDGE:**  May I inquire, are we in the queue?

6             **THE COURT:**  Yes.  At this point, you are in the

7     queue, yes.  And you are -- I wouldn't say you're at the bottom

8     of it either.  I'd say you're kind of about midway up the

9     queue, due to the age of the case.

10            **MR. BURBIDGE:**  All right.  Thank you.

11            **THE COURT:**  So I mean, realistically, we're probably

12    looking at spring, summer next year, hopefully, if things

13    continue to -- if things go well.

14            **MR. BURBIDGE:**  Is the Court -- again, I don't mean to

15    be offensive or presumptuous, but is the Court setting

16    tentative dates in the spring and is that a possibility, to

17    have a date set and then if something happened, obviously it

18    could be pushed?

19            **THE COURT:**  I'll give some thought on that.  Once I

20    get the material -- you know, once we get through this stuff

21    today and if there's anything you need to get back to me on,

22    I -- I don't have a problem with setting a date sometime next

23    year, but it would have to be on the understanding that it's

24    pretty aspirational, based on the -- you know, it just depends

25    on where we are on the criminal cases and how soon we're able

1    to reopen and start holding other civil cases.  I would be open

2    to setting a date, but on the understanding that it's somewhat

3    aspirational.

4            **MR. BURBIDGE:**  We would accept that understanding,

5    Your Honor, and also would note our experience that with a

6    trial date it is helpful to motivate mediation.

7            **THE COURT:**  Well, sure.  Sure.  I mean I think -- I

8    mean I'd be willing to put down -- aspirationally, I'd be

9    willing to put something for about next summer, early next

10   summer maybe, if the parties want to give that some thought.

11           **MR. BURBIDGE:**  We would appreciate it, just speaking

12   for the plaintiff, Your Honor.

13           **THE COURT:**  Yeah.  Though, as I said, there's at

14   least a couple of jury trials on the civil side that do have

15   precedence over this.  And if -- you know, if those or the

16   criminal cases get in the way, it would have to slide.  I have

17   one, oh, it's a products liability multi-MDL case that got sent

18   away to MDL for a long time and then came back here and got

19   tee'd up just about before the pandemic began, and that case

20   was brought in 2012.  And so that has to -- I have to get that

21   tried as soon as I can once I can hold civil cases.

22           And I have another couple that are pretty -- you

23   know, pretty old and really need to be handled quickly.  But,

24   yeah, let's talk about that in a minute, but maybe we could

25   settle an aspirational date for May, June, July, something in

1    that ballpark.

2          But before we get to that -- all right.  If we have

3    something like that in mind, what would be a good date to say

4    for mediation cutoff?  And I guess cutoff's not the right word,

5    but the date by which mediation should have been held?

6          Mr. Benevento, do you have thoughts about that?

7          **MR. BENEVENTO:**  Certainly.  As you may know,

8    Your Honor, a lot of it depends upon the mediator's schedule,

9    but given the fact that we have finished discovery, finished

10    dispositive motion practice and only have motions in limine and

11    other final pretrial matters, I would propose no later than

12    November 1.

13          **THE COURT:**  November 1.  What about you,

14    Mr. Burbidge, do you have thoughts about that?

15          **MR. BURBIDGE:**  The problem that I have, we have, is

16    we're booked solid with jury trials, that is -- and if we're

17    going to have a meaningful mediation exercise, I'd want to be

18    able to spend, you know, the time and energy necessary to be

19    effective at that.  So I think I'd push it into maybe the end

20    of January.  We've got an open January.  To show you how

21    pollyannish I was, Judge, I've got a big circle around

22    January 2022 for a trial.

23          **THE COURT:**  Well, that would be great but,

24    unfortunately, that's probably not going to work out.

25          **MR. BURBIDGE:**  So I would suggest, from the

1    plaintiff's point of view, by the end of January.

2         **THE COURT:**  All right.  And I think -- given where we

3    are on the trial, I think that's not unreasonable.  Why don't

4    we say February 1st is the date by which I'd like the parties

5    to have engaged in mediation.  Of course, you're welcome to

6    continue to discuss and try and settle after that point, but I

7    at least want you to make a good faith concerted effort at

8    mediation that's concluded no later than February 1st.

9         **MR. BURBIDGE:**  Okay.

10         **THE COURT:**  All right.  Now, Mr. Burbidge, I assume

11   that you're seeking a jury trial; is that correct?

12         **MR. BURBIDGE:**  Yes, Your Honor.

13         **THE COURT:**  Okay.  All right.  Now, maybe this is

14   mooted if we kind of try and pencil in a date, but about how

15   much notice do you feel like you would need to prepare for a

16   trial?

17         **MR. BURBIDGE:**  Well, if we had four weeks' notice,

18   certainly that would be plenty for us.  I'm looking at my

19   partners.  Four weeks.

20         **THE COURT:**  Right.  Does the defendant have a

21   different view?

22         Would you be able to pull your defense together in

23   four weeks?

24         **MR. BENEVENTO:**  I would say that that would be

25   impossible to do.  The rules require at least 30 days' notice

1   for exhibits, final pretrial, voir dire, special verdict form,

2   objections to exhibits, et cetera.  So even if you were to say,

3   we're ready to go in four weeks, that would still be impossible

4   to meet the deadlines established in Rule 26.

5          We have 27 witnesses, Your Honor, seven of whom

6   are -- two of whom are out of the country in Japan and

7   Kazakhstan, four of which are in other states, such as

8   Pennsylvania, Oregon, Maryland and North Carolina.  So I would

9   hope that we could get at least 60 days' notice, maybe 90 days'

10  notice.  That would allow us then to file our motions in limine

11  and all the rest of the information necessary in order to have

12  an effective trial.

13         **THE COURT:**  All right.  Thank you.  And the rules, of

14  course, can be waived if the parties, you know, want to move to

15  trial faster, but I take your logistical issues, what you're

16  saying.

17         Mr. Burbidge?

18         **MR. BURBIDGE:**  Well, one of the things we can

19  obviously do is, we can achieve all of those objectives early

20  on, have them done and so we could move without reference to

21  all those designations, they having been made.

22         **MR. BENEVENTO:**  It was my understanding, Your Honor,

23  that he was so booked with trials he couldn't possibly mediate

24  until January, but I'm certainly willing to do whatever the

25  Court wants to move the case forward.

1     **THE COURT:**  All right.  Well, it seems to me like it

2   might make sense, as I sit here just thinking about this, that

3   maybe, as I said, if I want mediation to have occurred by

4   February 1st, that maybe around February 1st I should issue --

5   if mediation is not successful, I should issue a trial order at

6   that point that gets the ball started on the trial preparation.

7     **MR. BURBIDGE:**  Excellent idea, from the plaintiff's

8   point of view, Your Honor.

9     **THE COURT:**  And then that way, we would be prepared,

10  you know.  And that would still -- you know, if we do that, I

11  could build in the kind of time I think that would be helpful

12  for you, Mr. Benevento, you know, in terms of being able to,

13  you know, do the motions in limine right, being able to

14  exchange exhibits, you know, all the stuff that we would like

15  to have happen before the trial.

16    **MR. BENEVENTO:**  Very well.  Thank you.

17    **THE COURT:**  Because at that point we'd still probably

18  be at least 90 days plus from when the trial would actually be

19  able to be held.

20    **MR. BENEVENTO:**  That would be great.

21    **THE COURT:**  I think why don't we -- why don't we plan

22  on mediation being completed by February 1st, the parties

23  giving me a report, a status report on mediation by

24  February 8th, and I will issue a trial order on February 15th

25  that will -- and I may tweak -- if for whatever reason those

1    dates are Saturdays or Sundays or something, I may tweak them a

2    little bit.  And I don't have my calendar in front of me, but

3    it will either be those dates or something very close to them

4    with the same sequence.

5         And then the trial order will set forth a schedule,

6    you know, that supplements the federal rules for disclosures

7    and so forth and for filing proposed jury instructions, for

8    filing motions in limine, all of that.

9         All right?  All right.

10        How many days will the trial take?  I think,

11   Mr. Burbidge, you were suggesting two or three weeks.  Is that

12   what you're thinking?

13        **MR. BURBIDGE:**  Yes, Your Honor.

14        **THE COURT:**  Which?

15        **MR. BURBIDGE:**  Well, again, I didn't think I was

16   going to be the one to dictate the time for the trial, but I

17   mean I think we could do it in two weeks, but I would not think

18   it would extend beyond three.

19        **THE COURT:**  Mr. Benevento, do you have a different

20   view?  Do you think we'd need more than three or do you feel

21   like we'd need less than that?

22        **MR. BENEVENTO:**  I think 15 trial days, including

23   opening and closing, would be sufficient.

24        **THE COURT:**  Right.  Would that include jury

25   selection, too?

1      **MR. BENEVENTO:**  I don't know how you do jury

2    selection.  If you do it, yes; if we do it, I'd add another

3    day.

4           **THE COURT:**  Okay.  All right.  I've done it both

5    ways.  It kind of -- it depends.

6           All right.  Let me just throw a couple other things

7    out there.  And I don't want you to say whether or not you

8    consent to this at this time.  I just want you to listen and

9    then you can get back to me on this.

10          First, if both parties consent, it may be possible

11   for a magistrate judge to hold the trial earlier than I could,

12   because the magistrate judges are not permitted to hold

13   criminal trials.  So once the Court resumes multiple jury

14   trials at the same time, a magistrate judge might be able to

15   schedule the trial promptly.

16          By contrast, as I've said, I certainly cannot promise

17   that I can do that, given the large number of criminal and

18   civil cases I have that are awaiting trial.

19          And if the parties, again, agreed to hold a bench

20   trial before the magistrate judge, that could probably happen

21   as soon as the parties are ready, since the Court can

22   accommodate a bench trial at the same time criminal jury trials

23   are proceeding, even while we're only holding one jury trial at

24   a time.

25          Now, please don't tell me your thoughts about the

1    option of a consent trial before a magistrate judge right now,

2    but please consult with each other and file a status report

3    within 30 days letting me know whether the parties are

4    interested in pursuing that option, and I'll consent to that.

5           And if there is interest in consent, please let me

6    know whether the parties agree to a bench trial before the

7    magistrate judge or would want a jury trial.

8           Now, if any of the parties don't consent to the

9    option of a trial before a magistrate judge, please tell me

10   that as well, but please don't tell me which party or parties

11   objected.

12          Does that make sense?

13          So I just want you both to think about that and just

14   put in a status report in 30 days telling me whether the

15   parties have any agreement about proceeding in that sort of way

16   or if they're not interested, but don't tell me which party

17   objected, if there is an objection.  I --

18          **MR. BURBIDGE:**  From the plaintiff's point of view,

19   Your Honor, that's satisfactory.

20          **THE COURT:**  All right.  Mr. Benevento, is that

21   something you can do, talk to Mr. Burbidge and let me know

22   within 30 days whether or not the parties are interested in

23   pursuing a consent trial of some kind?

24          **MR. BENEVENTO:**  Yes, sir.

25          **THE COURT:**  All right.  I raise that primarily

1    because I think that could be handled a lot more expeditiously

2    just given how the dockets are.  But, of course, you have the

3    right not to consent to that, both of you do, and I'm concerned

4    enough about that right that I don't even want to know -- if

5    one of you doesn't consent, I don't want to know which one of

6    you it is.

7           All right.  Are there other matters about -- other

8    trial logistic matters that we should discuss?

9           Let me just put this out there as well.  Why don't

10   you -- when you submit this status report in 30 days telling me

11   your thoughts about a consent option, if you want to go forward

12   with the jury trial before me, why don't you propose available

13   dates in the months of May, June, July and August of 2022.  If

14   you could just provide preferably more than one.  You know, the

15   more windows you provide of -- let's plan on 16 days, let's

16   plan on jury selection plus 15 days, just to be safe.  If you

17   could give me at least a couple, maybe two or three options of

18   16-day windows between May and August of 2022 where the parties

19   would both be available, I'd appreciate that.

20          All right.  So what I anticipate right now is a

21   status report, a joint status report.  If you can agree on the

22   content, great, if you disagree on the content, you can have

23   separate sections, but a joint status report within 30 days; a

24   requirement that mediation take place no later than

25   February 1st; that the parties submit a status report regarding

1  the outcome of mediation no later than February 8th with a view

2  to my issuing a trial order on or around February 15th.

3          So that's what I anticipate right now.  As I said, I

4  may tweak the dates a little bit if I find that February 1st is

5  a Sunday or something, but anything else we need to discuss at

6  this time?

7          **MR. BURBIDGE:**  Not from the plaintiff's point of

8  view.  Thank you, Your Honor.

9          **THE COURT:**  Thank you.

10         Mr. Benevento, anything else?

11         **MR. BENEVENTO:**  No, sir.

12         **THE COURT:**  All right.  And I'll put these dates in

13  the docket text order -- or the minute entry, rather, for this

14  hearing, as well as the disposition of the motions.

15         All right.  If there's nothing else, we're now

16  adjourned.  Thank you.

17         **MR. BURBIDGE:**  Thank you.

18         (Concluded at 4:00 p.m.)

19

20

21

22

23

24

25

CERTIFICATE OF COURT REPORTER


This is to certify that the proceedings in the foregoing matter were reported by me in stenotype and thereafter transcribed into written form;

That said proceedings were taken at the time and place herein named;

I further certify that I am not of kin or otherwise associated with any of the parties of said cause of action and that I am not interested in the event thereof.

In witness whereof I have subscribed my name this 17th day of August 2021.

Teena Green, RPR, CSR, CRR, CBC